## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TRISTRATA TECHNOLOGY, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-00652 (JJF) |
| | ) | |
| EMULGEN LABORATORIES, INC., | ) | |
| DOCTOR'S DERMATOLOGIC FORMULA | ) | |
| AND BORLIND OF GERMANY, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT EMULGEN LABORATORIES, INC.'S MOTION TO DISMISS OR TRANSFER

Arthur G. Connolly, III (No. 2667)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141

Attorneys for Plaintiff
Tristrata Technology, Inc

Michael O. Warnecke
PERKINS COIE, LLP
131 South Dearborn, Suite 1700
Chicago, IL 60603
(312) 324-8400

Kevin M. McGovern
Brian T. Foley
MCGOVERN & ASSOCIATES
14 E. 60th Street, Suite 606
New York, NY 10022
(212) 688-9840

Dated: May 2, 2007

## TABLE OF CONTENTS

I.  SUMMARY OF ARGUMENT ............................................................. 1

II. FACTUAL BACKGROUND ............................................................ 2

   A.  The TTI Patents And Prior Litigation Before This Court .............................. 2

   B.  Emulgen's Contacts With Delaware .................................................. 3

III. ARGUMENT ......................................................................... 3

   A.  Emulgen's Marketing And Sales Activities In Delaware Are
      Sufficient To Establish This Court's Personal Jurisdiction Over Emulgen .... 3

      1.  Personal jurisdiction over Emulgen is consistent with due process. .......... 4

         a.  Emulgen purposeful ly targeted its direct marketing efforts and
            its interactive, commercial website towards Delaware residents,
            resulting in sales to residents of Delaware. ............................... 4

         b.  The patent infringement claim arises out of or relates to Emulgen's
            activities in Delaware. ................................................... 6

         c.  Emulgen cannot overcome the presumption that the District of
            Delaware's assertion of personal jurisdiction is reasonable and fair... 7

      2.  The Delaware long-arm statute permits the exercise of personal
         jurisdiction over Emulgen. ................................................... 9

         a.  Emulgen transacts business in Delaware under section 3104(c)(1)
            of the long-arm statute. ................................................... 9

         b.  Emulgen has caused tortious injury in Delaware by an act in
            Delaware under section 3104(c)(3) of the long arm statute. ................ 10

   B.  Venue Is Proper In The District Of Delaware Because Personal
      Jurisdiction Exists There ........................................................... 11

   C.  Defendant Has Not Met Its Burden To Support Transfer To The
      Northern District Of Illinois: The Northern District Of Illinois Is Not
      "Clearly More Convenient," Nor Would Transfer Serve The Interest
      Of Justice ......................................................................... 11

      1.  The private factors do not favor transfer .................................... 12

      2.  The public factors do not favor transfer .................................... 14

IV. CONCLUSION ....................................................................... 15

## TABLE OF AUTHORITIES

**Cases**

*3D Sys., Inc. v. Aarotech Lab., Inc.,*
   160 F.3d 1373 (Fed. Cir. 1998) ................................................................... 4, 5, 6

*Affymetrix v. Synteni, Inc.,*
   28 F. Supp. 2d 192 (D. Del. 1998)................................................................... 13

*American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.,*
   No. Civ.A.99-218-SLR, 1999 WL 615175 (D. Del. Aug. 3, 1999) ..................... 5, 9

*Ballard Medical Prod. v. Concord Lab., Inc.,*
   700 F. Supp. 796 (D. Del. 1988)...................................................................... 14

*Burger King Corp. v. Rudzewicz,*
   471 U.S. 462 (1985).......................................................................................... 7

*Capitol Records, Inc. v. Optical Recording Corp.,*
   810 F. Supp. 1350 (S.D.N.Y. 1992) ................................................................. 14

*Competitive Tech. Inc. v. Carolina Liquid Chemistries Corp.,*
   No. CIVA05CV01678PSFCBS, 2006 WL 898131 (D. Col. April 4, 2006) ............ 6

*Continental Cas. Co. v. Am. Home Assurance Co.,*
   61 F.Supp.2d 128 (D.Del.1999)....................................................................... 12

*Hildebrand v. Steck Mfg. Co., Inc.,*
   279 F.3d 1351 (Fed. Cir. 2002) ........................................................................ 4

*Hollyanne Corp. v. TFT, Inc.,*
   199 F.3d 1304 (Fed. Cir. 1999) ........................................................................ 6

*Inamed Corp. v. Kuzmak,*
   249 F.3d 1356 (Fed. Cir. 2001) ..................................................................... 4, 7

*Intel Corp. v. Broadcom Corp.,*
   167 F. Supp. 2d 692 (D. Del. 2001).............................................................. 9, 10

*Jumara v. State Farm Ins. Co.,*
   55 F.3d 873 (3d Cir. 1995) ........................................................................ 11, 13

*LaNuova D&B S.p.A. v. Bowe Co.,*
   513 A.2d 764 (Del. 1986) ........................................................................... 9, 10

*Merck & Co., Inc. v. Barr Lab., Inc.,*
   179 F. Supp. 2d 368 (D. Del. 2002).................................................................. 8

*Motorola Inc. v. PC-Tel, Inc.,*
    58 F. Supp. 2d 349 (D. Del. 1999)..................................................................................... 9

*Nice Sys., Inc. v. Witness Sys., Inc.,*
    No. CIV A 06-311-JJF, 2006 WL 2946179 (D. Del. Oct. 12, 2006) ................................ 12, 13

*Nilssen v. Osram Sylvania, Inc.,*
    No. Civ. A. 00-695-JJF, 2001 WL 34368395 (D. Del. May 1, 2001) ...................................... 14

*North American Phillips Corp. v. American Vending Sales, Inc.*
    35 F.3d 1576 (Fed. Cir. 1994) ......................................................................................... 10, 11

*Optical Recording Corp. v. Capitol-EMI Music, Inc.,*
    803 F. Supp. 971 (D. Del. 1992)............................................................................................ 14

*Osteotech, Inc. v. Gensci Regeneration Sciences, Inc.,*
    6 F. Supp. 2d 349 (D.N.J. 1998) ........................................................................................ 5, 8

*Padcom, Inc. v. Netmotion Wireless, Inc.,*
    No. Civ. 03-983-SLR, 2004 WL 1192641 (D. Del. May 24, 2004)...................................... 5, 10

*Pennwalt Corp. V. Purex Indus., Inc.,*
    659 F. Supp. 287 (D. Del. 1986)............................................................................................ 12

*Pierce v. Hayward Indus., Inc.,*
    No. 05-5322, 2006 WL 3242274 (E.D. Pa. Nov. 6, 2006) ........................................................ 6

*Shutte v. Armco Steel Corp.,*
    431 F.2d 22 (3d. Cir. 1970) .................................................................................................... 12

*Trilegiant Loyalty Solutions, Inc. v. Maritz, Inc.,*
    No. Civ.A. 04-360 JJF, 2005 WL 441077 (D. Del. Feb. 15, 2005)......................................... 13

*United States Golf Ass'n. v. U.S. Amateur Golf Ass'n.,*
    690 F. Supp. 317 (D.N.J. 1988) .............................................................................................. 4

*VE Holding Corp. v. Johnson Gas Appliance Co.,*
    917 F.2d 1574 (Fed. Cir. 1990) .............................................................................................. 11

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.,*
    952 F. Supp. 1119 (W.D. Penn. 1997).................................................................................. 4, 5

**Statutes**

28 U.S.C. § 1400 (b)............................................................................................................ 1, 11

28 U.S.C. § 1391(c) ............................................................................................................. 1, 11

28 U.S.C. § 1404(a) ........................................................................................................... 11

35 U.S.C. § 271 ..................................................................................................................... 7

10 Del. C. § 3104(c) ....................................................................................................... 9, 10

**TABLE OF APPENDICES**

| Appendix | Description |
|---|---|
| A | Affidavit of Mark D. Steele |
| B | http://www.jevene.com web pages |
| C | http://sa.eximpact.com/AntiWrinkle/index.asp?aff=EX53 web pages |
| D | *American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.*, No. Civ.A.99-218-SLR, 1999 WL 615175 (D. Del. Aug. 3, 1999) |
| E | *Padcom, Inc. v. Netmotion Wireless, Inc.*, No. Civ. 03-983-SLR, 2004 WL 1192641 (D. Del. May 24, 2004) |
| F | *Pierce v. Hayward Indus., Inc.*, No. 05-5322, 2006 WL 3242274, (E.D. Pa. Nov. 6, 2006) |
| G | *Competitive Tech. Inc. v. Carolina Liquid Chemistries Corp.*, No. CIVA05CV01678PSFCBS, 2006 WL 898131 (D. Col. April 4, 2006) |
| H | *Nice Sys., Inc. v. Witness Sys., Inc.*, No. CIV A 06-311-JJF, 2006 WL 2946179 (D. Del. Oct. 12, 2006) |
| I | *Trilegiant Loyalty Solutions, Inc. v. Maritz, Inc.*, No. Civ.A. 04-360 JJF, 2005 WL 441077 (D. Del. Feb. 15, 2005) |
| J | *Nilssen v. Osram Sylvania, Inc.*, No. Civ. A. 00-695-JJF, 2001 WL 34368395 (D. Del. May 1, 2001) |

Plaintiff, TriStrata Technology, Inc. ("TTI"), by and through its attorneys, Perkins Coie LLP, hereby submits the following brief in opposition to Defendant Emulgen Laboratories Inc.'s ("Emulgen" or "Defendant") motion to dismiss or transfer (the "Motion").

## I. SUMMARY OF ARGUMENT

TTI brought this action for patent infringement arising out of Emulgen's willful and deliberate infringement of five TTI patents concerning alpha hydroxyacids (the "TTI Patents").  Notwithstanding Emulgen's arguments to the contrary, both personal jurisdiction and venue are proper in the District of Delaware.

Emulgen is subject to the personal jurisdiction of this Court because it has directed its marketing and sales activities towards, and sold its infringing product to, Delaware residents.  Emulgen admittedly advertised and offered its product for sale to Delaware residents through a direct solicitation e-mail campaign.  Emulgen also admits that this e-mail campaign resulted in sales of the infringing product to Delaware residents. In addition, Emulgen offers its product for sale to Delaware residents on its interactive website.  Having intentionally transacted business with Delaware residents, Emulgen cannot avoid this Court's personal jurisdiction, which is proper under both the Federal Circuit's due process test and the Delaware long-arm statute.

Venue is also proper in the District of Delaware under 28 U.S.C. §1400(b) because Emulgen "resides there" within the meaning of 28 U.S.C. § 1391(c).  Because personal jurisdiction is proper in the District of Delaware, venue is also proper there.

There is also no basis for transferring this matter to the Northern District of Illinois because Emulgen has not demonstrated that the transferee forum is "clearly more

convenient, nor has it shown that transfer would serve the interest of justice. TTI's

chosen forum, the District of Delaware, has substantial ties to TTI and also to the events

giving rise to this lawsuit. TTI's witnesses, who outnumber Emulgen's, are all in and

around Delaware. Moreover, two of TTI's witnesses are elderly and would be severely

burdened by travel to Illinois. Transfer to the Northern District of Illinois would only

shift the inconvenience from Emulgen to TTI, and Emulgen has not claimed that it will

be unable to litigate in Delaware. This Court's extensive experience presiding over

litigation of the patents at issue, including having rendered a *Markman* ruling, strongly

favors retaining this matter in the District of Delaware.

Therefore, Emulgen's motion to dismiss for lack of personal jurisdiction and

venue, and its motion to transfer, should all be denied.

## II.  FACTUAL BACKGROUND

### A.  The TTI Patents And Prior Litigation Before This Court

Plaintiff TTI is a Delaware company with its office and principal place of

business in Wilmington, Delaware. *See* Appendix A, Affidavit of Mark D. Steele

("Steele Aff."), ¶ 4. TTI is the assignee and sole owner of the TTI Patents. *Id.* The TTI

Patents relate to the use of alpha hydroxyacids to treat various skin conditions, such as

wrinkles and other signs of aging. *Id.*

TTI has protected its rights under the TTI Patents by filing patent infringement

lawsuits against alleged infringers. *Id.*, ¶ 10. The first of these lawsuits was filed in 1996

in the District of Delaware before this Court. During the course of that litigation, Judge

Farnan issued a *Markman* order construing the relevant terms in the TTI Patents. *Id.*, ¶

11. TTI has since litigated several other cases under the TTI Patents or related patents,

most of which have resulted in a settlement and license agreement. *Id.*, ¶ 12. However,

two of the cases proceeded to a full jury trial resulting in favorable jury verdicts for TTI.
*Id.* All of the cases filed by TTI relating to the TTI Patents were filed in the District of
Delaware and have been assigned to this Court. *Id.*, ¶ 13.

### B.  Emulgen's Contacts With Delaware

Emulgen is an Illinois corporation, Motion (D.I. 14) at 2, that makes a skin care
product based on alpha hydroxyacid technology.  Complaint (D.I. 1) at ¶ 19;
*http://*www.jevene.com (last visited April 17. 2007) (web pages attached as Appendix B).
At the time this complaint was filed, Emulgen's product was known as Liftvisage.
http://sa.eximpact.com/AntiWrinkle/index.asp?aff=EX53 (web pages attached as
Appendix C).  Currently, the product appears to go by the name Jevene.  *See* App. B.  At
the time the complaint was filed, and continuing to the present, Emulgen conducted
business through its website.  *See* Apps. B, C.  At the time the complaint was filed, the
website was http://eximpact.com.  *See* App. C.  Currently, the website is
http://www.jevene.com.  *See* App. B.  Neither site has geographical restrictions and both
allow purchases from all fifty states within the U.S.  *See* Apps. B, C.  Emulgen has also
conducted a direct e-mail marketing campaign of its infringing product to Delaware
residents.  Motion (D.I. 14) Ex. B at ¶ 3.  This e-mail campaign resulted in sales of
Emulgen's infringing product to Delaware residents.  *Id.*

## III.  ARGUMENT

### A.  Emulgen's Marketing And Sales Activities In Delaware Are Sufficient To Establish This Court's Personal Jurisdiction Over Emulgen

Emulgen has directed its marketing and sales activities toward, and has sold its
infringing product to, Delaware residents.  This Court may assert personal jurisdiction
over Emulgen because: (1) such an assertion would not violate due process; and (2)

3

Delaware's long-arm statute permits service of process, and thus the exercise of personal jurisdiction. *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1359 (Fed. Cir. 2001).

### 1. **Personal jurisdiction over Emulgen is consistent with due process.**

This court may constitutionally exercise specific personal jurisdiction over Emulgen because each element of the Federal Circuit's[1] three prong due process test is satisfied: (a) Emulgen purposefully directed its activities at Delaware residents; (b) the patent infringement claim arises out of those activities; and (c) the assertion of personal jurisdiction is reasonable and fair. *See 3D Sys., Inc. v. Aarotech Lab., Inc.*, 160 F.3d 1373, 1378 (Fed. Cir. 1998).

### a. **Emulgen purposefully targeted its direct marketing efforts and its interactive, commercial website towards Delaware residents, resulting in sales to residents of Delaware.**

This Court may exercise specific personal jurisdiction over Emulgen because this cause of action arose, in part, from Emulgen's marketing, solicitation and sale of its infringing products to Delaware residents. Emulgen marketed and offered its product for sale to Delaware residents through a direct solicitation e-mail campaign, Motion (D.I. 14) Ex. B at ¶ 3, and also on its interactive website. Apps. B, C. In addition, the e-mail campaign resulted in the sale of Emulgen's product to residents of Delaware. Motion (D.I. 14) Ex. B at ¶ 3. Any one of these activities, *standing alone*, is sufficient to establish personal jurisdiction. *See United States Golf Ass'n. v. U.S. Amateur Golf Ass'n.*, 690 F. Supp. 317, 320 (D.N.J. 1988) (court held specific personal jurisdiction established where defendant engaged in direct mail marketing to New Jersey residents, even though no business arose from it); *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119,

---

[1] In patent infringement cases, Federal Circuit law, not regional Third Circuit law, is applicable to the issue of whether there is personal jurisdiction over a defendant. *Hildebrand v. Steck Mfg. Co., Inc.*, 279 F.3d 1351, 1354 (Fed. Cir. 2002).

1124-26 (W.D. Penn. 1997) (explaining that interactive commercial websites would create personal jurisdiction and holding that a company doing business through its website was subject to the court's jurisdiction); *Osteotech, Inc. v. Gensci Regeneration Sciences, Inc.*, 6 F. Supp. 2d 349, 354 (D.N.J. 1998) ("[t]he law is clear that, where a defendant infringer is shown to have sold the allegedly infringing product in the forum state, the forum may exercise personal jurisdiction over the defendant"; court held single sale in forum state sufficient to confer specific personal jurisdiction).

Even if each activity were not enough standing alone, the combination of the three activities certainly is sufficient. *See 3D Sys., Inc.*, 160 F.3d at 1378-80 (court found defendant subject to specific personal jurisdiction in California based on sending promotional materials, sample parts and offers to sell to forum residents, in addition to purchasing parts from California to manufacture its product, even though no sales were made to forum residents); *American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.*, No. Civ.A.99-218-SLR, 1999 WL 615175, at *4 (D. Del. Aug. 3, 1999) (court exercised specific personal jurisdiction in Delaware over defendant who offered to sell infringing products to Delaware residents through a direct mail campaign, national advertisements accessible to Delaware residents on defendant's website, out-of-state sales negotiations with a Delaware resident, even where no sales were made to Delaware resident prior to filing complaint) (copy attached as Appendix D); *Padcom, Inc. v. Netmotion Wireless, Inc.*, No. Civ. 03-983-SLR, 2004 WL 1192641, at *4-6 (D. Del. May 24, 2004) (court held personal jurisdiction in Delaware proper where defendant did not actually have sales in Delaware but conducted a telemarketing campaign directed toward Delaware residents, entering into a joint marketing agreement by which its product would

be marketed to Delaware residents, e-mailed a newsletter to Delaware residents, and maintained a website that offered free trial downloads of its product) (copy attached as Appendix E); *Pierce v. Hayward Indus., Inc.*, No. 05-5322, 2006 WL 3242274, at *5 (E.D. Pa. Nov. 6, 2006) ("To the extent that a direct solicitation or contractual agreement sent via email directly leads to a civil action, jurisdiction is regularly exercised.") (copy attached as Appendix F); *Competitive Tech. Inc. v. Carolina Liquid Chemistries Corp.*, No. CIVA05CV01678PSFCBS, 2006 WL 898131, at *5 (D. Col. April 4, 2006) (court found specific personal jurisdiction where defendant directly solicited customers in forum state by direct mailing, telephone and email contacts, as well as maintaining an interactive website that allowed customers to order the infringing product, even though no sales of the product occurred) (copy attached as Appendix G).

Emulgen directed its activities toward Delaware and sold the infringing product to Delaware residents. Therefore, the first element of the personal jurisdiction test is unquestionably satisfied.

**b. The patent infringement claim arises out of or relates to Emulgen's activities in Delaware.**

Emulgen cannot deny that the patent infringement claim against it "arises out of or relates to" its activities in Delaware. *3D Sys., Inc.*, 160 F.3d at 1378 ("patent infringement results from an offer to sell as well as the sale itself"). Emulgen's admitted offers to sell and actual sales of the infringing product to Delaware residents clearly relate to or form a basis for TTI's infringement claim. 35 U.S.C. § 271 ("[W]hoever without authorization makes, uses, offers to sell or sells any patented invention…infringes the patent."). Nothing more is required under this element of the due process test. *Hollyanne Corp. v. TFT, Inc.*, 199 F.3d 1304, 1308 n.4 (Fed. Cir. 1999) ("[T]he test is whether the

6

activity in the forum is *a* basis for the cause of action.") (emphasis in original); *Inamed Corp. v. Kuzmak*, 249 F.3d at 1362 ("[I]t is significant that the constitutional catch-phrase ["arises out of or relates to"] is disjunctive in nature, indicating an added flexibility and signaling a relaxation of the applicable standard from a pure 'arises out of' standard."). Thus, the second element of the personal jurisdiction test is also satisfied.

### c.  Emulgen cannot overcome the presumption that the District of Delaware's assertion of personal jurisdiction is reasonable and fair.

Because TTI has satisfied the first two elements of the due process test, the burden shifts to Emulgen to persuade this Court that the exercise of personal jurisdiction would be unreasonable and unfair. *Inamed Corp.*, 249 F.3d at 1363. A decision that personal jurisdiction is unreasonable or unfair should be "limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Id.* (internal quotations omitted). TTI, a Delaware corporation with its principal place of business in Delaware has a clear interest in adjudicating the dispute in Delaware. Similarly, the State of Delaware has a substantial interest in "providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors," such as Emulgen. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985). Thus, given these strong interests in adjudicating this dispute in Delaware, this is not one of the "rare situations" in which the exercise of jurisdiction would be unreasonable. *See Inamed Corp.*, 249 F.3d at 1363-64.

Emulgen has failed to present "a compelling case" that the exercise of jurisdiction would be unreasonable or unfair. *Id.* at 1364. It complains that it doesn't have the same "resources" as TTI and that it cannot afford to employ two lawyers (one in Illinois and

7

one in Delaware). Motion (D.I. 14) at 7-8. However, while Emulgen may have less financial wherewithal than TTI, Emulgen does not aver that it will be unable to defend itself in Delaware. Emulgen, having identified only one witness, Dr. Banerjee, cannot credibly claim that it cannot afford the cost of a few plane tickets to travel to Delaware. Furthermore, Emulgen's assertion that it cannot afford two lawyers is disingenuous, as its motion to dismiss reveals that it is in fact employing attorneys in both Delaware and Illinois. Motion (D.I. 14) at 9. In addition to failing to present any significant barriers to litigating in Delaware, Emulgen has also admittedly transacted business with Delaware residents. Motion (D.I. 14) Ex. B at ¶ 2. Therefore, it would not be unfair or unreasonable to require Emulgen to travel to Delaware.

Moreover, Emulgen's argument regarding the percentage of its sales in Delaware is relevant only to establishing general jurisdiction, and does not prevent this Court from exercising specific jurisdiction over Emulgen. *Osteotech, Inc.*, 6 F. Supp. 2d at 354. The case Emulgen relies upon, *Merck & Co., Inc. v. Barr Lab., Inc.*, 179 F. Supp. 2d 368 (D. Del. 2002) is inapposite because there, the plaintiff had conceded that specific jurisdiction was not available, thus the court was analyzing only whether general jurisdiction could be asserted. 179 F. Supp. 2d at 371. TTI, on the other hand, asserts that this Court's personal jurisdiction over Emulgen is based on specific jurisdiction.

Thus, the third element of the personal jurisdiction test is satisfied. Because TTI has demonstrated that all three elements of the due process test are satisfied, this Court should hold that an exercise of personal jurisdiction over Emulgen would not offend due process.

8

## 2. The Delaware long-arm statute permits the exercise of personal jurisdiction over Emulgen.

The Delaware long-arm statute provides several independent bases on which a court may assert jurisdiction over a nonresident defendant. *See* 10 Del. C. § 3104(c). "The Delaware Supreme Court has stated that Delaware's long-arm statute should be 'broadly construed…to the maximum extent possible under the due process clause.'" *Intel Corp. v. Broadcom Corp.*, 167 F. Supp. 2d 692, 700 (D. Del. 2001) (*quoting LaNuova D&B S.p.A. v. Bowe Co*., 513 A.2d 764, 768 (Del. 1986)). TTI has already demonstrated that this Court would not offend due process by exercising its jurisdiction over Emulgen. Thus, at least one provision of the long-arm statute should be construed to permit jurisdiction over Emulgen. *See Motorola Inc. v. PC-Tel, Inc.*, 58 F. Supp. 2d 349, 356 n.9 (D. Del. 1999) (holding that the Delaware long-arm statute is coextensive with due process). While TTI believes that no further analysis in necessary, TTI will demonstrate that this Court may exercise jurisdiction over Emulgen based on at least two different provisions of the long-arm statute.

### a. Emulgen transacts business in Delaware under section 3104(c)(1) of the long-arm statute.

Emulgen has transacted business in Delaware within the meaning of 10 Del. C. § 3104(c)(1) because, as demonstrated *supra* pp. 4-6, its conduct was part of a "general business plan" that infringed on TTI's rights. *Intel Corp.*, 167 F. Supp. 2d at 703. Emulgen's solicitation of Delaware residents and its actual sales to them constitute transacting business under § 3104(c)(1). *See Intel Corp.*, 167 F. Supp. 2d at 703-05 (Court held that the defendant had transacted business under 3104(a)(1) by offering to sell and selling infringing products in Delaware before and after the filing date of the lawsuit); *American Bio Medica Corp.*, 1999 WL 615175, at *4 (holding that defendant

who offered to sell infringing products to Delaware residents through its Internet website and other promotional materials, even though no products were sold to Delaware residents, had transacted business pursuant to § 3104(c)(1)); *Padcom, Inc.*, 2004 WL 1192641, at *5-6 (defendant who had solicited business in Delaware and made trial versions of its product available for download on its website, which was downloaded by Delaware resident, had transacted business under § 3104(a)(1)).  Even though Emulgen may not have been physically present in Delaware, its activities took place in Delaware within the meaning of § 3104(c)(1).  *Intel Corp.,* 167 F. Supp. 2d at 701 (court rejected the defendant's argument that none of this activity took place "in Delaware"); *cf. North American Phillips Corp. v. American Vending Sales, Inc.* 35 F.3d 1576, 1579 (Fed. Cir. 1994) ("to sell an infringing article to a buyer in Illinois is to commit a tort there.").

### b.  Emulgen has caused tortious injury in Delaware by an act in Delaware under section 3104(c)(3) of the long arm statute.

Emulgen committed the tort of patent infringement in Delaware pursuant to § 3104(c)(3) by offering to sell and actually selling infringing products to Delaware residents.  *LaNuova & B, Sp.A. v. Bowe Co., Inc.*, 513 A.2d 764, 768 (Del. 1986) ("a single 'act or omission' in the state in which the injury was caused will suffice" to establish jurisdiction under § 3104(c)(3)).  Emulgen cannot claim that its acts did not occur in Delaware.  *See North American Phillips Corp.*, 35 F.3d at 1578-79 (holding, as a matter of federal law, that the tort of patent infringement occurs "where allegedly infringing sales are made," and that in the context of the Illinois tort long-arm provision, "to sell an infringing article to a buyer in Illinois is to commit a tort there").  Therefore, Emulgen's sale of infringing products to Delaware residents confers personal jurisdiction over it under § 3104(c)(3).

### B.  Venue Is Proper In The District Of Delaware Because Personal Jurisdiction Exists There

Venue is proper in the District of Delaware under 28 U.S.C. § 1400 (b) because

Emulgen "resides" in Delaware.  28 U.S.C. § 1391(c) (providing that a defendant

corporation resides "in any judicial district in which it is subject to personal jurisdiction

at the time the action is commenced").  Because TTI has demonstrated that Emulgen is

subject to personal jurisdiction in the District of Delaware, venue is also proper there.

*See VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1583 (Fed. Cir.

1990) (under amended § 1391(c) "venue in a patent infringement case includes any

district where there would be personal jurisdiction over the corporate defendant at the

time the action is filed"); *North American Philips Corp.*, 35 F.3d at 1577 n.1 ("Venue lies

ipso facto if we hold, as we do, that the district court has personal jurisdiction over [the

defendants].").

### C.  Defendant Has Not Met Its Burden To Support Transfer To The Northern District Of Illinois: The Northern District Of Illinois Is Not "Clearly More Convenient," Nor Would Transfer Serve The Interest Of Justice

In resolving a § 1404(a) request for transfer, courts analyze both private and

public factors.  *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995).  Private

factors include: (1) plaintiff's choice of forum; (2) defendant's preference; (3) whether

the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative

physical and financial condition; (5) the convenience of the witnesses—but only to the

extent that the witnesses may actually be unavailable for trial in one of the fora; and (6)

the location of files and records.  *Id.*  Public factors include: (1) the enforceability of the

judgment; (2) practical considerations that could make trial easy, expeditious or

inexpensive; (3) the relative administrative difficulty in the two fora resulting from court

congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with applicable state law in diversity cases. *Id.* at 879-80. The burden is on Emulgen to establish that the balance of the interests weighs strongly in favor of the requested transfer. *Nice Sys., Inc. v. Witness Sys., Inc.*, No. CIV A 06-311-JJF, 2006 WL 2946179, at *1 (D. Del. Oct. 12, 2006) (*citing Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d. Cir. 1970)) (copy attached as Appendix H). A transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer. *Id.* (*citing Continental Cas. Co. v. Am. Home Assurance Co.,* 61 F.Supp.2d 128, 131 (D.Del.1999)). Emulgen has fallen far short of meeting its burden to justify transfer.

### 1.  <u>The private factors do not favor transfer</u>

Far from weighing strongly in favor of transfer, the private factors actually weigh against transfer. First, TTI's choice of forum is to be accorded "paramount consideration." *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970) Emulgen's burden in this regard is especially difficult to overcome because Delaware has a very strong connection to TTI as its state of incorporation and principal place of business, and also has a strong connection to the suit because the infringement occurred there. *Affymetrix v. Synteni, Inc.*, 28 F. Supp. 2d 192, 199 (D. Del. 1998); *Pennwalt Corp. V. Purex Indus., Inc.*, 659 F. Supp. 287, 289 (D. Del. 1986). Additionally, this Court is already familiar with the subject matter of this suit, as TTI has litigated five patent infringement actions before this Court involving the TTI Patents, and this Court has rendered a *Markman* ruling on them.

Second, the convenience of the witnesses and location of records does not favor transfer to Illinois. While Emulgen's witnesses and documents may be located in Illinois,

12

all of TTI's documents and witnesses are located in and around Delaware. The co-inventors of the TTI Patents, Doctors Yu and Van Scott, reside in Pennsylvania and are 75 and 86 years old, respectively. App. 1, Steele Aff. ¶ 5. Therefore, if this case were transferred to Illinois, the burden on the Doctors if called as witnesses would be significant. Another prospective TTI witness, Mark Steele, resides in New Jersey. *Id.*, ¶ 3. All other prospective TTI witnesses, who are employees of TTI and TTI's affiliate, NeoStrata Co. Inc., also reside in and around Delaware. *Id.*, ¶ 6. Emulgen, however, has identified only one potential witness, Dr. Banerjee, and has not shown that he would be unavailable for trial in Delaware. *Jumara*, 55 F.3d at 879 (convenience of witnesses only relevant to the extent that they would be unavailable for trial in the forum). Nor has Emulgen shown that it would be unable to produce documents in Delaware. *See Trilegiant Loyalty Solutions, Inc. v. Maritz, Inc.*, No. Civ.A. 04-360 JJF, 2005 WL 441077, at \*2

(D. Del. Feb. 15, 2005) (court did not consider location of records where defendant did not contend that they "could not be produced or would be unavailable" in the forum state) (*citing Jumara*, 55 F.3d at 879)) (copy attached as Appendix I). Therefore, these factors clearly weigh against transfer.

Emulgen has stated that it has less "resources" than TTI but it has not averred that it cannot afford to litigate in Delaware. Emulgen cannot credibly claim that it does not possess sufficient resources to fly its single witness to Delaware if need be. Moreover, Emulgen's claim that it cannot afford to pay two lawyers is belied by its Motion, which reveals that it already is employing two lawyers, one in Illinois and one in Delaware. Motion (D.I. 14) at 9. A transfer of this action from Delaware to Illinois would merely

13

shift the inconvenience from Emulgen to TTI, which is not a basis for transfer. *Nice Sys., Inc.*, 2006 WL 2946179, at \*2 (*citing Ballard Medical Prod. v. Concord Lab., Inc.*, 700 F. Supp. 796, 801 (D. Del. 1988)).

Finally, the infringement claim arose in Delaware at least to the same extent as it arose in Illinois as Emulgen was marketing and selling infringing products all over the country. Therefore, on balance, the factors weigh against transfer and this Court should retain the action.

### 2. **The public factors do not favor transfer**

Emulgen has also failed to establish that the public factors warrant transfer. While the judgment may have to be enforced in Illinois, Emulgen has not pointed to any other factor that weighs in favor of transfer, and has thus failed to meet its burden. The fact that this Court is already familiar with the subject matter of this suit through prior litigation, including having already rendered a *Markman* ruling on the TTI Patents, weighs strongly in favor of this Court retaining this matter. *See, e.g., Optical Recording Corp. v. Capitol-EMI Music, Inc.*, 803 F. Supp. 971, 974 (D. Del. 1992) (motion to transfer denied where court familiar with patents from prior litigation). *Compare Capitol Records, Inc. v. Optical Recording Corp.*, 810 F. Supp. 1350, 1354 (S.D.N.Y. 1992) (case transferred where transferee forum already familiar with patents at issue due to prior litigation); *Nilssen v. Osram Sylvania, Inc.*, No. Civ. A. 00-695-JJF, 2001 WL 34368395, at \*4 (D. Del. May 1, 2001) (court transferred case to court that had already issued *Markman* rulings on patents at issue, and where same patents already being litigated in multiple other suits in transferee forum) (copy attached as Appendix J). TTI has litigated five patent infringement actions before this Court involving the TTI Patents

14

or related patents against over 20 different manufacturers.  This court should deny

Emulgen's motion to transfer venue and retain this matter in the District of Delaware.

## IV.  CONCLUSION

For the foregoing reasons, TTI respectfully requests that this Court deny

Emulgen's motion to dismiss for lack of personal jurisdiction and venue, and its motion to

transfer venue.

DATED: May 2, 2007                              TRISTRATA TECHNOLOGY INC.


                                                 /s/ Arthur G. Connolly, III
                                                Arthur G. Connolly, III (No. 2667)
                                                CONNOLLY BOVE LODGE & HUTZ LLP
                                                1007 N. Orange Street
                                                P.O. Box 2207
                                                Wilmington, DE 19899
                                                (302) 658-9141

Michael O. Warnecke
PERKINS COIE, LLP
131 South Dearborn, Suite 1700
Chicago, IL 60603
(312) 324-8400

Kevin M. McGovern
Brian T. Foley
MCGOVERN & ASSOCIATES
14 E. 60th Street, Suite 606
New York, NY 10022
(212) 688-9840

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 2, 2007, the foregoing document was served via First-Class U.S. Mail and CM/ECF on the following counsel of record:

| | |
|---|---|
| Karen E. Keller, Esq.<br>Young, Conaway, Stargatt & Taylor<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>Wilmington, DE 19899 | Ronald A. Stearney, Jr., Esq.<br>Law Offices Of Ronald A Stearney<br>211 W. Wacker Drive, Suite 500<br>Chicago, IL 60606 |
| Muriel Kulow, President<br>Börlind of Germany<br>962 Route 11<br>Sunapee, NH 03782-3015 | Susan G.L. Glovsky, Esq.<br>HAMILTON BROOK SMITH REYNOLDS<br>530 Virginia Road<br>P.O. Box 91133<br>Concord, MA 01742<br>(978) 341-0136 |
| President<br>DDF Skincare<br>28 Wells Avenue<br>Building 3<br>Yonkers, NY 10701 | |

   /s/Arthur G. Connolly, III
Arthur G. Connolly, III (#2667)

#536087_1

# APPENDIX A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TRISTRATA TECHNOLOGY, INC.      )
                                         )

        Plaintiff,               )
                                         )

     v.                             )     Case No. 1:06-CV-00652
                                         )

EMULGEN LABORATORIES, INC.,     )
DOCTOR'S DERMATOLOGIC FORMULA   )
AND BORLIND OF GERMANY, INC.     )
                                         )

        Defendants.         )

## AFFIDAVIT OF MARK D. STEELE IN SUPPORT OF
## PLAINTIFF'S OPPOSITION TO DEFENDANT EMULGEN'S MOTION TO DISMISS
## OR TRANSFER

Mark D. Steele, being first duly sworn, deposes and says:

1.     I serve on the Board of Directors of Tristrata Technology, Incorporated ("TTI").

2.     I serve on the Board of Directors of Tristrata Inc., which assigned the patents at issue in this matter to TTI.

3.     My work address is 307 College Road East, Princeton, New Jersey, and I reside in the State of New Jersey.

4.     TTI is a Delaware corporation with its principal place of business at 1105 North Market Street, Suite 1300, P.O. Box 8985, Wilmington, Delaware 19899.  TTI is a patent holding company in the business of developing and licensing novel dermatological, pharmaceutical and skin care product technology.  TTI is the assignee and sole owner of certain patents issued to Drs. Van Scott and Yu relating to the use of alpha hydroxyacids ("AHAs") to treat various skin conditions, such as wrinkles and other signs of aging, collectively referred to as the "TTI Patents":

        (a)     U.S. Patent No. 5,091,171 (the "'171 Patent"), issued on February 25, 1992, entitled "Amphoteric Compositions and Polymeric Forms of Alpha

1

Hydroxyacids, and Their Therapeutic Use", and which reexamination certificate B2 issued on July 15, 1997.

(b)     U.S. Patent No. 5,385,938 (the "'938 Patent"), issued on January 31, 1995, entitled "Method of Using Glycolic Acid for Treating Wrinkles", and which reexamination certificate B1 issued on July 15, 1997.

(c)     U.S. Patent No. 5,389,677 (the "'677 Patent"), issued on February 14, 1995, entitled "Method of Treating Wrinkles Using Glycolic Acid", and which reexamination certificate B1 issued on July 15, 1997;

(d)     U.S. Patent No. 5,422,370 (the "'370 Patent"), issued on June 6, 1995, entitled "Method of Using 2-Hydroxypropanoic Acid (Lactic Acid) for the Treatment of Wrinkles", and which reexamination certificate B1 issued on July 15, 1997;

(e)     U.S. Patent No. 5,547,988 (the "'988 Patent"), issued on August 20, 1996, entitled "Alleviating Signs of Dermatological Aging With Glycolic Acid, Lactic Acid or Citric Acid", and which reexamination certificate B1 issued on July 15, 1997.

5.     Tristrata Inc. was formed in 1994 by the inventors of the TTI Patents – Doctors Ruey Yu and Eugene Van Scott – who are pioneers in the field of the use of AHAs to treat various skin conditions. Doctors Yu and Van Scott both reside in Pennsylvania and are 75 and 84 years old respectively.

6.     In addition to Drs. Yu and Van Scott, the other TTI witnesses in this action would be agents or employees of TTI and TTI's affiliate NeoStrata Co. Inc.

7.     TTI maintains all of its corporate records at its principal place of business in Delaware.

8.     TTI is not registered to do business in Illinois, nor does TTI have a registered agent in Illinois. TTI has no employees or offices in Illinois. TTI does not own or lease property in Illinois, maintain books or records in Illinois, have bank accounts in Illinois, or pay taxes in Illinois. TTI does not offer products or services for sale in Illinois, nor does TTI conduct any other business in Illinois.

2

9.    TTI has engaged in an extensive licensing program including the TTI Patents, as well as other patents. TTI has entered into non-exclusive license agreements under the TTI Patents with several of the largest manufacturers and marketers in the cosmetics industry. Over the last 13 years, TTI has continuously negotiated with and licensed to much of the cosmetic and pharmaceutical market. During that time, the TTI licensing program has generated over 30 licenses relating to one or more of the TTI Patents, which have been the subject of periodic press releases and news stories in the cosmetic industry.

10.    In addition, TTI has protected its rights under the TTI Patents by filing patent infringement lawsuits against alleged infringers.

11.    The first of these lawsuits was filed in 1996 in the District of Delaware before Judge Joseph Farnan. During the course of that litigation, Judge Farnan issued a *Markman* order construing the relevant terms in the TTI Patents.

12.    TTI has since litigated several other cases under the TTI Patents and related patents, most of which have resulted in a settlement and license agreement. However, two of the cases proceeded to a full jury trial resulting in favorable jury verdicts for TTI: *TTI v. Long's Drug Stores, et al.* (Case No. 01-127 (JJF)) and *TTI v. ICN Pharmaceuticals, et al.* (Case No. 01-150 (JJF)). Both of these cases involved months of discovery and full jury trials, ultimately resulting in favorable jury verdicts for TTI.

13.    All of the cases filed by TTI relating to the TTI Patents have been filed in the District of Delaware and have been assigned to Judge Farnan.

14.    I make this affidavit from personal knowledge and, if called upon, could testify competently as to the matters set forth herein.

3

FURTHER AFFIANT SAYETH NOT.

Subscribed and sworn to before me
this ___1st___ day of ___MAY___, 2007.

_Kristi M. Scrocca_

Notary Public for _Monmouth_ County,
_NJ_

My commission expires: _8|29|2011_

Acting in _Monmouth_ County

Mark D. Steele

KRISTI M. SCROCCA
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 8/29/2011
_Kristi M. Scrocca_

# APPENDIX B

# Jevené | The Essence of Youth



- Home
- Anti-Wrinkle Cream
- Eye Cream
- FAQ's
- Customer Service

___

Jevené, **The Essence of Youth** skin care products contain exclusive formulas that help to create more healthy looking skin. With only a few weeks use you will look and feel dramatically different.

## Jevené Products

- **8-in-1 Anti-Wrinkle Cream**
  - Find Out More
- **All-in-One Eye Cream**
  - Find Out More

**Developed by renowned Harvard trained scientist Dr. Santimoy Banerjee PHD**, Jevené, The Essence of Youth skin care products contain exclusive formulas that help to create more healthy looking skin. With only a few weeks use you will look and feel dramatically different. These formulas are based on a specific blend of natural ingredients including hydroxy acids and antioxidants that help create more healthy looking skin.

**Women and men of any age** can use these products with the same amazing results. While no product can eliminate wrinkles, within one week you will notice a glow to your skin that you haven't seen in years. With continued use your skin will appear younger, healthier, and more beautiful than you ever thought possible. With the Jevené product line, you can renew your skin and bring back the same healthy, radiant look you had in your youth. Jevené skin care line is like a time machine for your skin's appearance, taking it back to the days before sun damage, acne scars, and age spots.

**Jevené comes highly recommended** by world renowned German dermatologist, Dr. Eduard G. Coeugniet. His findings on the benefits of Jevené for his patients were so profound that he was asked to present them at several medical conferences throughout Europe. The word about Dr. Banerjee's formulation continues to spread across the medical world.

read the letter from Dr. Banerjee...

___

- Copyright © 2004-2005 Jevene.com. All Rights Reserved
- Terms & Conditions | Your Privacy Rights





# Jevené
### THE ESSENCE OF YOUTH

| HOME | HOW IT WORKS | OUR PRODUCT | TESTIMONIALS | INGREDIENTS | FAQS | Customer Service |



# Lose the wrinkles!
## without painful injections

**THE PROVEN BENEFITS OF JEVENÉ**

 

- Reduce the appearance of wrinkles & age spots
- Penetrates and moisturizes your skin, producing noticeable changes
- Moisturizes deep below the skin's surface

**You're just a click away from witnessing the results first hand.**

**Buy it now for $89.95**    OR    **Try it for FREE**

Jevené vs. other treatments

## Why do invasive and costly procedures on your face that can have serious negative side effects?

Botox®* and other invasive treatments have very serious risks that can leave permanent damage to your face and health. With Jevené you get the benefits of youthful looking smooth skin without the adverse serious side effects.

| Jevené™ | Botox® Injections |
|---|---|
| The ingredients in Jevené are completely natural and safe | Botox is a drug derived from **Botulinum Toxin A.** - A deadly poison produced by Clostridium Botulinum - the bacterium that causes botulism. |
| There are **NO SIDE EFFECTS** with Jevené | Can cause bruising, droopy eyelids, difficulty breathing, muscle weakness, headaches and dizziness. |
| You get **SMOOTH YOUNGER LOOKING SKIN** with Jevené | Can result in the development of fine lines and wrinkles in other areas of the face** |
| Jevené can be safely applied on **ALL SKIN AREAS** | Botox®* is limited in where it can be applied: throat, neck areas, around the mouth and eyes to name a few** |
| Jevené is very **affordable and easy-to-use** | Botox®* is very costly and must be repeated every 2-4 months** |

**Buy it now for $89.95**        **Try it for FREE**

## Success Stories†

...I'm 46 years old and had very noticeable spots from having children and my skin was showing age. Your Jevené has lightened the spots to where they are hardly noticeable and my skin has a youthful appearance once again. Keep up the good work.
**- Margaret P.**

oh my god..... i have only been using your cream for less than 2 weeks now and I just got to tell you that it's everything it's all cranked up to be.
**- Kathy B. New York**

I have been using Jevené for three months now, and I feel that I can truly tell a difference in the way my skin feels and looks. I have been using it not only on my face but also on my neck, chest, and the backs of my hands. All of these areas are much smoother and nicer.
**- Marcia S., Stuart, Florida**

## The Jevené Difference

## Why is this anti-wrinkle cream different from all the others?

The answer lies in the unique 8 in 1 formula! **Developed by renowned Harvard trained scientist Dr. Santimoy Banerjee PHD**, Jevené, The Essence of Youth contains a exclusive patent pending formula of three special Hydroxy Acids known for exfoliating dead skin cells and three antioxidants, including Retinol which help to create more healthy looking skin.

Jevené is also enriched with the soothing properties of **Aloe Vera, Jojoba Oil and Vitamin E**. It penetrates and moisturizes your skin, producing noticeable changes. With only a few weeks use, you will look and feel dramatically different.

**Jevené comes highly recommended** by world renowned German dermatologist, Dr. Eduard G. Coeugniet. His findings on the benefits of Jevené for his patients were so profound that he has been asked to present them at several medical conferences through out Europe. The word about Dr. Banerjee's formulation continues to spread across the medical world.

**Women and men of any age** can use this product with the same amazing results. Within one week, you will notice a glow to your skin that you haven't seen in years. With continued use you skin will appear younger, healthier, and more beautiful than you ever thought possible. With Jevené, you can renew your skin and bring back the same healthy, radiant skin you had in your youth. Jevené is like a time machine for your skin's appearance, taking it back to the days before sun damage, acne scars, and age spots.

### Success Stories†

First of all, I want to tell you how THRILLED I am with the results. I am 70 yrs old, but my skin looks like that of a 45 or 50 yr old...
- **Robbie B. Aston**

I just want to say this cream is, by far, the best that I have tried and believe me I have tried many. I've been using the cream now for about 4 weeks consistently and can definitely tell a difference in the wrinkles around my eyes and around my mouth...
- **Sherrie**

I am compelled to write you and declare to you, personally, what a wonderful product it is." "I have seen significant fading of skin discoloration and wrinkles...
- **M.A. Ashworth**

Read more success stories...

Buy it now for $89.95        OR    Try it for FREE

## Letter from Dr. Santimoy Banerjee PHD

Dear Friend,

I've spent over 30 years as a biochemist, including eleven years of working in the field of surfactants and their applications in different industries, including cosmetics. I have a PHD in Biochemistry and have post-doctoral training in reputed academic institutions such as Harvard University, University of Chicago, and University of Illinois.

I simply applied my education and lab experience to develop a cream that protects the look of your skin from the ravages of Mother Nature.

Look at what one of our satisfied customers has to say...

"On July 11, 2004 my husband and I competed in the National Silhouette High-Power- Rifle Championship Matches in Raton, New Mexico. We had not seen any of our other competitors since last year in July. All the women asked me one on one (as they did not want to embarrass me) when did I have my face-lift and who did

it and where. I had a good laugh and told them all I had been doing was using for approximately three weeks a new face-cream. I was told that I looked years younger and I could not fool them, they insisted I had a face-lift.

"Only today I ended the saga: I wrote all thirteen women who shoot with me once a year how they could have "their face-lift" too. I told them all about "Jevené" and how to order this unprecedented product, the only one that kept the promise and proved to me with a free sample that it meant what it promised.

"I want to thank you and your company for this incredible ESSENCE OF YOUTH, it sure made me happy. I am married to a very handsome man who is thirteen years younger than I; you could see lately (before "Jevené") that I was the older one, but not anymore."

**- Helga M. Hooper, PhD**

Sincerely,

Dr. Santimoy Banerjee
Scientist & CEO
Emulgen Laboratories

Buy it now for $89.95     OR    Try it for FREE

* Botox® is a registered trademark of Allergan, Inc.
** According to an FDA study
† The Jevené beauty cream was previously marketed under the name Lift-Visage and the testimonials were with repect to Lift-Visage.

Copyright © 2004 - 2005 Jevene.com. All rights reserved. Customer Service | Terms & Conditions | Your Privacy Rights



**Jevené**™
THE ESSENCE OF YOUTH

HOME    FIND OUT MORE    INGREDIENTS    FAQ's    CUSTOMER SERVICE

# Say goodbye to
## Dark Circles and Puffy Eyes!

THE PROVEN BENEFITS OF
**JEVENÉ ALL-IN-ONE EYE CREAM**

Reduces appearance of dark circles
and puffiness

Protects the look of your skin

Penetrates and moisturizes your skin,
producing noticeable changes

**Buy it now for $69.95**    OR    **Try it for FREE**

## Find out more

**Like our 8 in 1 anti-wrinkle cream**, this amazing eye cream is specially formulated with natural ingredients, which whne used daily, helps to reduce the dreaded puffiness and dark circles that plague so many people. Jevené All-In-One Eye Cream also helps replenish, revive, and moisturize this delicate skin found under and round the eyes while also helping to protect the collegen found under the skin.

**Developed by Harvard trained Biochemist Dr. Santimoy Banerjee**. This unique blend of natural eye replenishing ingredients is the all in one solution for your eye care needs. No more spending hundreds of dollars on several different types of eye cream. Now you can get everything you need in one jar of Jevené's All-In-One Eye Cream.

> "I absolutely love Jevené All-In-One Eye Cream. I have been using it for 2 months now and the puffiness that used to be under my eyes is gone. My skin looks and feels like it did win I was young." - *Zahra F., 56, Los Angeles*

**Women and men of any age** can use this product with the same amazing results. Within one week, you will notice a glow to your skin that you haven't seen in years. With continued use the skin around and under your eyes will appear younger, healthier, and more beautiful than you ever thought possible. With Jevené All In One Eye Cream, you can renew your skin and bring back the same healthy, radiant skin you had in your youth. This amazing eye cream is like a time machine for your skin's appearance, taking it back to it's youthful appearance.

**Buy it now for $69.95**    OR    **Try it for FREE**

Letter from Dr. Santimoy Banerjee PHD

Dear Friend,

I've spent over 30 years as a biochemist, including eleven years of working in the field of surfactants and their applications in different industries, including cosmetics. I have a PHD in Biochemistry and have post-doctoral training in reputed academic institutions such as Harvard University, University of Chicago, and University of Illinois.

I simply applied my education and lab experience to develop a cream that protects the look of your skin from the ravages of Mother Nature.

Sincerely,

Dr. Santimoy Banerjee
Scientist & CEO
Emulgen Laboratories

**Buy it now for $69.95**   OR   **Try it for FREE**

Copyright © 2004-2005 Jevene.com. All Rights Reserved.

Customer Service | Terms & Conditions | Your Privacy Rights







**Order Summary**

| Item | Price | Quantity | Subtotal | |
|---|---|---|---|---|
| Jevene 8-in-1 Anti-Wrinkle Cream | 89.95 | 1 | 89.95 | Remove |
| Jevene All-In-One Eye Cream | 69.95 | 1 | 69.95 | Remove |





**Buy 2 Jevené Jars & Receive A Free\* Gift!**
Receive a complimentary jar of Jevené Anti-Wrinkle Cream or Jevené Eye Cream when you buy two jars.
Click the "Yes, I Want It" button to choose your gift.
You qualify to receive a Free\* Gift.
**Yes I Want It**

**Get an EXTRA $20 Off Your Order!**
Just by adding this FREE\* Video Professor Lesson, we'll give you an extra $20 off of your Jevené order. Only valid with credit card orders.
Click the "YES, I WANT IT" button, at right, for details.
**Yes I Want It**

Video Professor Offer is not available for residents of Wisconsin (WI).

| | |
|---|---|
| Subtotal | $159.90 |
| Discounts | - $0.00 |
| Tax | $0.00 |
| Shipping & Handling | $8.95 |
| **Order Total** | **$168.85** |

**California residents** must pay 8.25% sales tax ($13.19) which would make the total $182.04

**Continue Shopping**    **Update Quantity**

 **GeoTrust** Secure Site

**Continue with Order ↓**

Shipping address same as billing address?: ◉ Yes ○ No

**Billing Address**

First Name: [ ]
Last Name: [ ]
Address 1: [ ]
Address 2: [ ]
City: [ ]
State: [ Delaware ]
Zip/Postal Code:

**Shipping Address**

First Name: [ ]
Last Name: [ ]
Address 1: [ ]
Address 2: [ ]
City: [ ]
State: [ Delaware ]
Zip/Postal Code:

[ ] (5 digit zip code)                              [ ] (5 digit zip code)

**Country:** United States ▼                        **Country:** United States ▼

**Phone:** [ ]                                      **Phone:** [ ]
(i.e. 818-555-1212)                                 (i.e. 818-555-1212)

**Email:** [ ]

## Payment information
Please enter your credit card number below.

*We are not currently accepting VISA as payment.*

| Payment Method | Credit Card No. | Expiration Date | Cardholder's Name | CVV2# |
|---|---|---|---|---|
| Mastercard ▼ | [ ] | 01 ▼ 2005 ▼ | [ ] | [ ] |

### What is my CVV2 number?

For your security, enter your Card Verification ID, the last 3 digits located on the **back** of your credit card. For American Express, it's the 4 digits located **above** your credit card number. *Refer to the picture on the left.*

Visa, Mastercard & Discover **(3 digit)**        American Express **(4 digit)**

CVV2#: [ ]                                         CVV2#: [ ]

[ ] **I agree with the Terms below**

By using this site and placing this order you agree to Jevené's Privacy Policy and Terms and Conditions unless otherwise agreed in writing by Jevené and signed by both parties.



ORDER PROCESSING MAY TAKE UP TO 90 SECONDS.
TO PREVENT ERRORS, PLEASE CLICK THE "PROCEED WITH PURCHASE" BUTTON ONLY ONCE.

# APPENDIX C

# Irate Plastic Surgeons May Be Threatening A Class Action Lawsuit Against A Harvard Trained Scientist Who Could Have Solved Man's Greatest Quest To The *Fountain of Youth*!

Lawyers might be filing papers in every Courthouse across the Country, faster than the Attorney's Secretaries can process them. Plastic Surgeons are beside themselves over this new revolutionary Anti-Wrinkle Cream known as Lift Visage The Essence of Youth. Until now, the Anti-Wrinkle Cream Business could not touch that of the Plastic Surgeons. Then came along a Harvard Trained Scientist by the name of Dr.Santimoy Banerjee. Now, after years of testing he has brought his remarkable secrets to you and the Plastic Surgeons to their knees!

**He tested it himself and just listen to what he heard:**

Within a week, Dr. Banerjee began receiving numerous compliments from anyone, and everyone that knew him. His closest friends and family couldn't believe how much younger he looked in such a short period of time. In fact, his own son said "Dad, you look 15 years younger than your real age, what is the secret?"

Everyone wanted to know Dr. Banerjee's secret...

His secret is The Essence of Youth! Lift Visage removes dead skin cells while simultaneously creating new, healthy skin cells. With only a week of use, you will look and feel dramatically younger.

And Now, Dr. Banerjee has decided to offer the product for FREE! Yes, that's right I did say FREE! You may try a 7-day supply of **Lift Visage, The Essence of Youth** at no charge!

 

From The Desk: Dr. Santimoy Banerjee
Date:1/01/03

Dear Friend,

For the first time, you will be able to restore your youthful appearance within 7 days! A glow to your skin that you haven't seen for years. **This might be the most important letter you'll ever read.**

**Lift Visage, The Essence of Youth** contains a combination of special Hydroxy Acids known for regenerating new skin cells. The unique combination of invigorating ingredients will make a difference in your appearance... A difference that you, and those around you will notice, admire and appreciate!

## Don't believe me? Then read this:

"I heard about your product over the Internet. I was using Natural Advantage (advertised on TV by Kathie Lee Gifford) but my face felt dry and the coloring stayed uneven. So I decided to try your product- in the few weeks I've used it my skin and hands (which I use it on also) always feel soft and never dry and itchy. Also my skin coloring is more even, and the wrinkles around my eyes are a little less than when I used

> the other product. I was hoping your company had some type of gentle cleanser/ makeup remover that would be available soon. Please let me know. Thank you!"
>
> J. Chamberlain

Now, I know you're probably skeptical. That's normal and healthy. Let me give you three good reasons I can back up what I claim:

## Three Reasons to Believe in Lift Visage:

*ONE*: Lift Visage, The Essence of Youth, removes dead cells, rejuvenates new cells, moisturizes skin, reduces age spots and freckles, protects skin from environmental pollution, protects against sun damaging rays and has been known to assist in the healing of burns, wounds and scars.

*TWO*: Lift Visage, The Essence of Youth, is a moisturizer combined with special ingredients that allow it to penetrate deeply into your skin, thus allowing those unwanted wrinkles and age spots to disappear! The truth is, moisturizers can only temporarily plump up your skin and alleviate dryness but cannot penetrate deeply into your skin.

*THREE*: Lift Visage is a 5-in-1 anti-wrinkle, skin restoring, moisturizing cream that combines several proven anti-wrinkle and healthy skin promoting ingredients that bring about genuine results. Continued use of **Lift Visage, The Essence of Youth**, will create an everlasting change to your skin and the way you look forever. A glow to your skin that you haven't seen for years will be apparent within **1 week of application.**

### Get your FREE Sample today!

## Look at what this former Skin Care Professional from Estee Lauder and Christian Dior had to say:

> "I have been a Professional Skin Care Consultant and Make-up Artist for companies like Estee Lauder and Christian Dior. Lift Visage is significantly more effective than any other product I have ever used! In just 30 days I know some women will look ten years younger!"
>
> N. Prince

## What can Lift Visage Anti-Wrinkle Cream do for me?

*Lift Visage*

- Allows new cells to grow more easily-creating that smooth finish you have always wanted!

- Moisturizes skin throughout-keeping your skin healthy and glowing to the eye as well as the feel!

- Results in a more youthful and healthful appearance-allowing yourself to walk with confidence again!

- Reduces age spots and freckles-allowing you to hide those visible spots to those around you!

- Its like taking your skin to the cleaners-giving your skin that clean, fresh rejuvenating look and feel!

- Protects against the suns damaging rays-cutting down the risk of skin cancer!



" I've been using the product for about a month and I'm getting results. Keep in mind I'm 71 with sun-damaged skin so miracles are not expected, just a lessening of the depth of wrinkles and spots. Your product has three important things that make it appealing:

1. It's user friendly, it doesn't require a complex routine of products to make it effective-slap it on and let it work.
2. It's affordable, not overpriced. I'm not going to spend $60 of discretionary income every six weeks to keep the wrinkles at bay.
3. It works, and access is easy and you deliver quickly!

Pat Brigati

**Get your FREE Sample today!**

## Wondering how and why Lift Visage can do all these things?

"There are three primary reasons that cause the skin to age, the aging process itself, a buildup of dead skin cells, and sunlight/environmental pollutants" states Dr. Santimoy Banerjee, Scientist and CEO at Emulgen Laboratories.

The ingredients in Lift Visage are enriched with the healing properties of Aloe Vera, Boric Acid, Salicylic Acid, Jojoba Oil and Vitamin E, but the secret to this special skin care product is its special formulation that is highly effective in exfoliating dead skin cells and generating new ones.

## Do you look back nostalgically at preteen days when your skin had a healthy glow?

Lift Visage, The Essence of Youth, reverses the aging process of the skin by reducing wrinkles and lines, eliminating age spots, controlling the greasy "T-zone" area and rapidly regenerating new skin cells which allows you to regain that healthy glow of years past.

The results are dramatic, and with continued use you will notice a younger, healthier and more beautiful "you" than you ever thought possible.

## How many times, have you paid out good money for a bad skin care product?

How often have you parted with your money in the hopes of purchasing a skin care moisturizer with great expectations of seeing an improvement to your skin, yet it never seems to live up to its billing?

The true value of any product lies in its ability to "come up with the goods". If you buy something and it does not do what it promises, then you have wasted every penny you've spent.

If, on the other hand you buy Lift Visage The Essence of Youth and experience all we say you will, then you will feel like your ripping us off. That's a win, win situation that we can all rest easy with.

## Don't take my word for it, listen to what this Doctor and an Actress had to say:

"Lift Visage is a product unlike any other that I have tried. It actually accomplished what it promised. Within just a week of using it, I visibly had younger looking skin. Some of my patients even asked me if I had some work done on my face. I compared Lift Visage with other products and I can tell you that Lift Visage was by far superior - no contest. I promptly set about returning those products and ordering more Lift Visage... a woman on a mission. I look forward to recommending this product to all my patients as I know that they will have the same fantastic results that I did. Thank you for creating Lift Visage."

Dr. Christina S Wagner

"The Lift Visage face cream (moisturizer) is the best product I have ever used..."My face feels smooth, is clear of blemishes and is never dry."... A little Lift Visage goes a long way..."

J.H. White, Actress

### Get your FREE Sample today!

## Changes your skin as effectively as Cosmetic Surgery!

Revitalize your skin with Lift Visage, The Essence of Youth Do you remember a time when your skin was so smooth, all your relatives wanted to pinch your cheeks? Do you look back nostalgically at preteen days when your skin had a healthy glow, not an oily sheen? Our wrinkle cream, developed by a Harvard trained scientist, has been getting rave reviews.

## Restore your skin's Youthful Appearance with Age-Defying, Lift Visage!

Want to rid yourself of the fine lines and wrinkles creeping in around your mouth and eyes? Tired of applying layers of makeup to cover age spots and freckles? Need a product that can moisturize your skin without making it greasy and causing breakouts? Then Lift Visage is the product for you!

## Lift Visage, The Essence Of Youth reverses the aging process of the skin.

You can renew your skin and bring back the same healthy, radiant skin you had in your youth with Lift Visage. It is like a time machine for your skin, taking it back to the days before sun damage, acne scars, and age spots.

Reduce wrinkles and fine lines. Banish age spots and freckles. Moisturize without making your skin oily or greasy. Protect skin from environmental pollutants and harmful sun damage. Lift Visage will make your skin look and feel significantly different with only a few weeks use.

"I have used your cream for the last few months, and have noticed a big difference in my skin. It felt alot tighter and had a glow, which was not there, before. Well, I happened to see an infomercial about a skin care line, by Lee Valentine. So, I ordered it, because they were very convincing....After I received it and started using it a few days later, I noticed that my skin looked like shi-!! I could not believe how different my skin was looking. So, that's when I decided to order 2 jars of your Lift Visage......GREAT STUFF!!! Thank-you, very much!"

Donna Hing

### Get your FREE Sample today!

## Why is this Anti-Wrinkle Cream different from all the others?

- 5-in-1, skin restoring, moisturizing cream that combines several proven healthy skin promoting chemicals that bring about genuine results in making sure your skin is healthy and vibrant.

- Continued use of Lift Visage, The Essence of Youth, will create an everlasting change to your skin and the way you look and feel forever.

- The ingredients in Lift Visage are enriched with the properties of Aloe Vera, Boric Acid, Salicylic Acid, Jojoba Oil and Vitamin E which are all used in a healing process.

- The secret of this special skin care product is in its special formulations that are highly effective in disposing of dead skin cells and generating new ones, thus allowing your skin to be shiny and sheen.

- Reduces wrinkles and lines, eliminates age spots, controls the greasy "T-zone" area and rapidly regenerates new skin cells, giving you that bright new skin you have always wanted.

- Known to promote the healing of scars and burns, thus eliminating the visibility of your abrasion.

- The results are dramatic and with continued use you will notice younger, healthier and more beautiful skin than you ever thought possible.

## See what this other Doctor had to say:

"I had some black spots (about 2cm. diameter) on both sides of my face. After 7 days of use (twice a day) the black stains on my face were reduced considerably." "I observed that there was a little dark stain on my face. After use for one month, it is now almost invisible."

Dr. G.C. Majumder, Ph.D.

### Get your FREE Sample today!

## You have nothing to lose.... __EXCEPT__ of course your wrinkles, lines, age spots, and more!

## Do NOT buy any Anti-Wrinkle product unless
## it meets the following 6 criteria:



1. Removes dead cells

2. Rejuvenate old cells and foster the growth of new ones

3. Moisturize skin

4. Reduce age spots and freckles

5. Protect skin from environmental pollution

6. Protect against the suns damaging rays



**Get your FREE Sample today!**

| | BEFORE: | AFTER: |
|---|---|---|
| **LIFT VISAGE** The Essence of Youth<br><br>*"I just received my order of 3 jars. I really love this product. I like the way you treat your customers, from far I can feel the warmth."*<br><br>*Arlette P.* |  |  |

## Membership Program:

**Special Offer!** This is a complimentary service to ensure that you never miss a jar! As a member of our preferred Membership Program, you will receive a 30-day supply every month. The timely refill program guarantees a fresh supply of **Lift Visage, The Essence of Youth** conveniently delivered to your door. Which means you'll never need to worry about remembering to re-order.

Dr. Banerjee recommends that you use the cream regularly, especially during the first 90 days of use. This program ensures that you don't stop the results you are starting to achieve. You are not obligated to purchase after you receive the initial free trial and you can cancel anytime.

In summary, your **FREE** benefits will include:

- **7-Day Free Lift Visage, The Essence of Youth Trial**
- **Hassle-free shipments delivered to you automatically each month!**

- **Bonus! Microfiber Towelette Face Cleansing Set w/first 30-day supply**
- **Weekly Newsletter keeping you up to date on all current skin related issues!**

| Qty | Description | Price |
|-----|-------------|-------|
| 1 | Free 7-Day Supply Lift Visage, The Essence of Youth Trial | FREE |
| 1 | Bonus! Microfiber Towelette Face Cleansing Set w/first 30 day supply | FREE |
| 1 | Lift Visage Membership Program | FREE |

Sub-total: FREE

Shipping & Handling: $1.99
Total: $1.99

To your health,

*[signature]*

**Dr. Santimoy Banerjee**
**Scientist and CEO**
**Emulgen Laboratories**

**P.S.** Remember, our introductory low price is time limited and we can't guarantee it will be this low for long. I can only guarantee you a super effective product at a more than reasonable price if you order right away. So don't delay. Act now while it's fresh in your mind.

**Get your FREE Sample today!**

The previous was an advertisement. The views expressed in it are those of the Advertiser only. As with any business you could make more or less money than the results described. Your results will be based on your individual monetary investments, business experience, expertise, and your level of desire. There are no guarantees concerning the level of success you may experience, other than the advertiser's product/service performance return policy, if applicable. The only place success comes before work is in the dictionary.

©2002 EXImpact Technologies. All rights reserved.

# APPENDIX D

Westlaw

Not Reported in F.Supp.2d                                                                        Page 1
Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Ⓒ
American Bio Medica Corp. v. Peninsula Drug
Analysis Co., Inc.
D.Del.,1999.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
AMERICAN BIO MEDICA CORPORATION,
Plaintiff,
v.
PENINSULA DRUG ANALYSIS CO., INC.; James
T. Ramsey; Phamatech, Inc .; Dipro Diagnostic
Products, Inc.; Dipro Diagnostic Products of North
America, Inc., Defendants.
**No. Civ.A. 99-218-SLR.**

Aug. 3, 1999.

Daniel F. Wolcott, Jr., Gregory A. Inskip, and Joanne
Ceballos, of Potter, Anderson & Corroon LLP,
Wilmington, Delaware, and Charles Michael Tobin, of
Hopkins & Sutter, Washington, D.C., for plaintiff.
Matthew B. Lehr, and Maryellen Noreika, of Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware, and
Edward W. Moore, of Dallas, Texas, for defendants
Peninsula Drug Analysis Co., Inc.; James T. Ramsey;
DiPro Diagnostic Products, Inc.; and DiPro Diagnostic
Products of North America, Inc., Doreen L. Costa, Neil
P. Sirota, and Steven R. Gustavson, of Baker & Botts,
L.L.P., New York, New York, of counsel.
Kevin W. Goldstein, of Ratner & Prestia, Wilmington,
Delaware, for defendant Phamatech, Inc., Steele N.
Gillaspey, of Gillaspey, Harms & Associates, San
Diego, California, of counsel.

MEMORANDUM OPINION
ROBINSON, J.

I. INTRODUCTION

**\*1** Pending before the court are motions to dismiss or
transfer venue filed by defendants Dipro Diagnostic
Products of North America, Inc. ("Dipro"), Phamatech,

Inc. ("Phamatech"), and Peninsula Drug Analysis Co.,
Inc. and James T. Ramsey ("Peninsula" and "Ramsey,"
respectively). (D.I. 17, 25 and 49) Plaintiff American
Bio Medica Corporation ("ABMC") opposes said
motions. ABMC owns the rights to U.S. Design Patent
No. D404812, which patent issued on January 26, 1999.
ABMC is a New York corporation engaged in the
manufacture, worldwide distribution and sale of the
Rapid Drug Screen, a product covered by the patent at
issue. According to ABMC, when the Rapid Drug
Screen was developed in 1995, it was the first vertical,
hands free test for the detection of the presence of drug
residue in urine. Until February 1999, ABMC
purchased test strips from defendant Phamatech for
incorporation into the Rapid Drug Screen. ABMC
alleges that Phamatech initiated production of its own
vertical test kit (Quick Screen) in 1998 or earlier, using
proprietary information it acquired by reason of its
supply relationship with ABMC.

Defendant Phamatech is a California corporation.
According to ABMC, Phamatech distributes Quick
Screen through the auspices of defendants Peninsula
and Ramsey, among others. Defendant Dipro is a
Delaware corporation that, according to ABMC,
acquires directly or indirectly from Phamatech an
accused product called Rapid Response and distributes
that product through Peninsula and Ramsey, among
others. Peninsula is a Virginia corporation and Ramsey
is the sole stockholder and an employee of Peninsula.

Plaintiff ABMC initiated this lawsuit on April 7, 1999
against defendants for design patent infringement,
violation of the Lanham Act, and other acts of unfair
competition. A day later, on April 8, 1999, Phamatech
filed suit in the United States District Court for the
Southern District of California seeking a declaratory
judgment that ABMC's design patent is invalid, and
joining other federal and state claims essentially
mirroring the claims and operative facts at issue. By
decision issued June 21, 1999, Judge Keep of the
Southern District of California found that the California
court could exercise specific personal jurisdiction over
ABMC; however, applying the "first-filed" rule, she

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 2
Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

stayed the California case pending disposition of the instant motions.

## II. FACTS

The facts are essentially undisputed. Prior to the filing of the complaint, none of the accused products had been sold to a Delaware resident. In the fall of 1998, defendant Peninsula did ship an order of ABMC's Rapid Drug Screen to a Delaware resident, Pace Electric of New Castle, Delaware. Sometime thereafter and prior to January 1999, Peninsula stopped handling ABMC's product. In January 1999, defendant Ramsey and a third party met with a representative of Pace to discuss a possible business relationship for the sale and distribution of the Phamatech/Dipro product, Rapid Response, in Delaware. These discussions took place in Hawaii and Maryland. Although there are averments of record indicating that some agreement was reached (D.I.32), it is the court's understanding that no actual sales or movement of defendants' products occurred in Delaware prior to the filing of the complaint.

**\*2** Prior to April 1999, Peninsula sent direct mail postcards to Delaware as part of a mass mailing to potential customers in more than 20 states.[FN1] Both Ramsey and Phamatech maintain national Internet websites that can be accessed from Delaware. It is the court's understanding that these websites include promotional material about the allegedly infringing products, including information on ordering and shipping; however, orders cannot be consummated directly through the websites.

> FN1. Approximately 60 out of a total of 6,000 postcards were directed to Delaware residents. No responses are recorded.

## III. DISCUSSION

### A. Personal Jurisdiction

ABMC, as plaintiff, bears the burden of establishing that this court may exercise personal jurisdiction over defendants. When personal jurisdiction is contested without the benefit of discovery, the plaintiff need only establish a *prima facie* case with the record viewed in the light most favorable to the plaintiff. *See Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F.Supp. 1458, 1462 (D.Del.1991); *Computer People, Inc. v. Best Int'l Group, Inc.*, No. Civ. A. 16648, 1999 WL 288119, at \*4 & n. 5 (Del. Ch. Apr 27, 1999). There is no question but that this court can exercise personal jurisdiction over defendant Dipro, a Delaware corporation. The focus of the following discussion, therefore, is whether the exercise of personal jurisdiction over the remaining defendants comports with the law of the Federal Circuit.[FN2]

> FN2. According to the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out-of-state accused infringer, the law of the Federal Circuit, "rather than that of the regional circuit in which the case arose," is applicable. *Akro Corp. v. Luker*, 45 F.3d 1541, 1543 (Fed.Cir.1995).

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a court may dismiss a suit for "lack of jurisdiction over the person." According to the United States Supreme Court,

before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). The principle pronounced above is traditionally described in this court as a two-step analysis. The court will determine, first, whether there is amenability to service and, second, whether the exercise of jurisdiction offends the defendants' rights to due process.

Rule 4(e)(1) of the Federal Rules of Civil Procedure states that service of a summons may be effected

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                           Page 3
Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

"pursuant to the law of the state in which the district court is located." The Delaware long-arm statute, 10 Del. C. § 3104(c), has been construed "broadly ... to confer jurisdiction to the maximum extent possible under the due process clause." *LaNuova D & B S.p.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986). As noted by this court in *Intel Corp. v. Silicon Storage Tech., Inc.,* 20 F.Supp.2d 690, 694 (D.Del.1998), "[t]he Delaware Supreme Court has not determined that § 3104(c) is coextensive with federal due process, nor does it substitute federal due process analysis for state long-arm analysis." *Accord Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd.,* 611 A.2d 476, 480-81 (Del.1992); *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods. Inc.,* Civ. A. No. 12036, 1991 WL 129174, at *3 (Del. Ch. July 10, 1991); *Ramada Inns v. Drinkhall,* No. Civ. A. 83C-AU-56, 1984 WL 247023, at *2 (Del.Super. May 17, 1984). Therefore, the court must determine that the exercise of personal jurisdiction is compatible with both the specific requirements of the Delaware long-arm statute and with defendants' constitutional rights to due process.[FN3]

> FN3. The Federal Circuit has instructed that, "in interpreting the meaning of state long-arm statutes, we ... defer to the interpretations of the relevant state and federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process." *Graphic Controls Corp. v. Utah Med. Prods., Inc.,* 149 F.3d 1382, 1386 (Fed.Cir.1998). Thus, in *Luker,* the Federal Circuit's analysis followed that of the Sixth Circuit's holding in *R.L. Lipton Distrib. Co. v. Dribeck Importers, Inc.,* 811 F.2d 967 (6th Cir.1987): " 'This Ohio [long-arm] statute has been construed to extend to the outer limits of due process, and thus an Ohio personal jurisdiction analysis becomes an examination of constitutional limitations.' " *Luker,* 45 F.3d at 1544 (quoting *Dribeck,* 811 F.2d at 969). By contrast, as noted above, the Delaware state courts do not collapse the long-arm inquiry into the due process inquiry and neither shall this court.

*3 Delaware's long-arm statute provides:
(c) As to a cause of action brought by a person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-resident, or his personal representative, who in person or through an agent:
(1) Transacts any business or performs any character of work or service in the State;
(2) Contracts to supply services or things in this State;
(3) Causes tortious injury in the State by an act or omission in this State;
(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State....

Del.Code Ann. tit. 10, § 3104(c)(1)-(4).

As explained by the Delaware Supreme Court in *LaNuova,*
[t]he conduct embraced in subsections (1) and (2), the transaction of business or performance of work and contracting to supply services or things in the State, may supply the jurisdictional basis for suit only with respect to claims which have a nexus to the designated conduct. Where personal jurisdiction is asserted on a transactional basis, even a single transaction is sufficient if the claim has its origin in the asserted transaction.

Similarly, where the claim is one for tortious injury under subsection (c)(3),
a single "act or omission" in the State in which the injury was caused will suffice. Such a claim may also be viewed as transactional.

*LaNuova,* 513 A.2d at 768. Therefore, in order to establish transactional or specific jurisdiction, plaintiff must demonstrate not only that an act or acts occurred in Delaware but also that its causes of action arise from those act or acts. According to relevant caselaw, plaintiff also must demonstrate that the act or acts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

occurring in Delaware actually constitute "transacting business" in Delaware, i.e., that defendants "purposefully avail[ed themselves] of the privileges and benefits of Delaware law." *Computer People, Inc.,* 1999 WL 288119, at *8; *see also Thorn EMI N. Am. v. Micron Tech., Inc.,* 821 F.Supp. 272, 274 (D.Del.1993) (stating that the designated conduct "must be directed at residents of the State of Delaware and the protection of its laws"). With this requirement in mind, courts have concluded that "[m]ere solicitation does not arise to transacting business, nor does the isolated shipment of goods into Delaware." *Id.* (citing *Moore v. Little Giant Indus., Inc.,* 513 F.Supp. 1043, 1047 (D.Del.1981); *Waters v. Deutz Corp.,* 460 A.2d 1332, 1335 (Del.Super.1983). The distinction between isolated business activities and those giving rise to personal jurisdiction has been explained on the basis of whether the conduct is "part of a general business plan ... to solicit business in Delaware and deliver products to customers in Delaware." *Thorn EMI,* 821 F.Supp. at 274.

*4 Plaintiff alleges in its complaint seven causes of action, including unlawful use of the trademarks and service marks of the Rapid Drug Screen in violation of the Lanham Act and common and state law trademark rights; violation of the design patent "by making, using and/or selling the ABMC design ..."; and engaging in unfair competition and deceptive trade practices. (D.I.1) Although the products at issue have not been made, used, or sold in Delaware, plaintiff asserts that, "[t]hrough offers and extensive planning to sell the infringing product in Delaware, defendants have engaged in a course of conduct that readily meets the nexus requirements of sections 3104(c)(1), (2), and (3)." (D.I. 57 at 7-8)

The record demonstrates that defendants Peninsula and Ramsey have offered to sell [FN4] allegedly infringing products to Delaware residents through what appears to be a concerted marketing effort. The marketing effort includes national advertisements accessible to Delaware residents (the internet website), out-of-state sales negotiations with a Delaware resident,[FN5] and the mailing of promotional materials to Delaware residents. Given the history of these defendants' relationship with plaintiff, the record adequately demonstrates that these activities are directed at Delaware residents, constitute "transacting business," and are sufficiently related to plaintiff's causes of action to satisfy the requirements of 10 Del. C. § 3104(c)(1). [FN6] *Cf. Computer People, Inc.,* 1999 WL 288119, at *8.[FN7]

FN4. Plaintiff did not specifically allege such in its complaint; however, 35 U.S.C. § 271(a) reads "whoever without authority makes, uses, offers to sell, or sells any patented invention ... infringes the patent." (Emphasis added)

FN5. The out-of-state sales negotiations with Pace Electric are viewed in tandem with defendants' other conduct as evidence of a general business plan directed at Delaware residents and the protection of its laws.

FN6. As noted, the court is satisfied that the activities described above are "part of a general business plan" and not isolated, unrelated events. In the past, this court has demanded as well proof that the activities have had a "tangible effect" in Delaware. *See,* e.g., *Intel Corp.,* 20 F.Supp. at 696 ("... SST's solicitations in Delaware [have not] been shown to have had any tangible effect on Intel's sales here."). Sales are lost generally because of the sale of competing products. Given the fact that liability under 35 U.S.C. § 271(a) can now rest on mere "offers to sell," the court is reluctant to require proof of actual sales and is not sure what other "tangible effect" is contemplated. Therefore, the court will not require evidence of "tangible effects" in this case.

FN7. Although the court noted that, "as a general matter telephone calls and an e-mail [to a Delaware resident] do not, in and of themselves, automatically constitute 'transacting business' within Delaware sufficient to invoke jurisdiction under § 3104(c)(1)," the court looked at the specific factual context and held that these contacts were insufficient because they could not be a

Not Reported in F.Supp.2d                                                                                   Page 5
Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

basis for the plaintiff's causes of action.

The court further finds that the exercise of personal jurisdiction over these defendants comports with federal due process considerations. The Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945), held that

due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintainance of the suit does not offend "traditional notions of fair play and substantial justice."

*Id.* at 316 (citation omitted). The Court in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985), added the further requirement that the minimum contacts be "purposeful" contacts, noting that "even a single act can support jurisdiction" so long as it creates a "substantial connection" with the forum, in contrast to an "attenuated affiliation." *Id.* at 475 n. 18. Therefore, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 477. In *Luker,* the Federal Circuit suggested a three-prong jurisdictional analysis: 1) has the defendant purposefully directed its activities at residents of the forum?; 2) do the claims arise out of or relate to those activities?; 3) is the assertion of personal jurisdiction reasonable and fair? *See Luker,* 45 F.3d at 1545-46. The court has already answered the first two inquiries in the affirmative and has not discovered in the record any compelling evidence which suggests that the exercise of personal jurisdiction over these defendants would be unreasonable.

**\*5** The court concludes otherwise with respect to defendant Phamatech. The conduct attributed to Phamatech includes the following: 1) Phamatech manufactures allegedly infringing products; 2) Phamatech arranges for the distribution of its product through defendants Peninsula and Ramsey; and 3) Phamatech advertises its product through an Internet website accessible to Delaware residents. As noted previously, however, there had been no actual sales of infringing product in Delaware prior to the filing of the

complaint. Neither is there evidence relating Phamatech to Peninsula and Ramsey's marketing efforts directed at Delaware residents. Although plaintiff asserts that "Phamatech intentionally established a chain of distribution that it knew, or reasonably could have foreseen, had a termination point in Delaware" (D.I. 62 at 11), the record does not demonstrate the existence of ongoing commercial relationships with retailers and customers in Delaware.

The facts of record are distinguishable, therefore, from the facts in *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1564 (Fed.Cir.1994), cited by plaintiff. In that case, the court concluded that the alleged infringers were placing accused products into the chain of commerce, which included shipping products into the forum for sale to customers through an intermediary. Because the commercial relationship with the intermediary was ongoing and the accused products in fact had been shipped into the forum, the court found the defendant amenable to the exercise of personal jurisdiction: "From these ongoing relationships, it can be presumed that the distribution channel formed by defendants and [the intermediary] was intentionally established, and that defendants knew, or reasonably could have foreseen, that a termination point of the channel was [the forum]." *Royal Sovereign,* 21 F.3d at 1564. Instantly, there is no evidence demonstrating that Phamatech directed Peninsula and Ramsey's sales efforts at Delaware residents; there certainly is no evidence of any ongoing commercial relationships between Phamatech, Peninsula/Ramsey, and Delaware residents. The final conduct designated is Phamatech's Internet website. Assuming for purposes of this motion that a website with product information constitutes an "offer to sell," in the absence of evidence that Delaware residents actually accessed this website, the court declines to find that Phamatech transacted business in Delaware, consistent with 10 Del. C. § 3104(c)(1) and (3).[FN8]

> FN8. Plaintiff does not assert general jurisdiction under § 3104(c) (4).

B. Venue

Not Reported in F.Supp.2d                                                                Page 6
Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**


Generally, in reviewing a motion for transfer of venue, this court gives great deference to a plaintiff's choice of forum and only transfers venue if the defendants truly are regional (as opposed to national) in character. Motions to transfer venue are granted as well if there is a related case which has been filed first or otherwise is the more appropriate vehicle to litigate the issues between the parties. Given the court's conclusion that it cannot exercise personal jurisdiction over defendant Phamatech, the manufacturer of the accused products, transfer of this case to the Southern District of California is warranted.


### IV. CONCLUSION

**\*6** For the reasons stated, defendants' motions to dismiss are granted in part and denied in part. Defendants' motions to transfer venue are granted.

An appropriate order shall issue.

D.Del.,1999.
American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.
Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX E

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 1192641 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

ℍ
Padcom, Inc. v. NetMotion Wireless, Inc.
D.Del.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
PADCOM, INC., Plaintiff,
v.
NETMOTION WIRELESS, INC. and Database
Solutions, Inc., Defendants.
No. Civ. 03-983-SLR.

May 24, 2004.

Josy W. Ingersoll, John W. Shaw, and Adam W. Poff,
of Young Conaway Stargatt & Taylor, LLP,
Wilmington, Delaware, Neil F. Greenblum, Van C.
Ernest, and Jill M. Browning, of Greenblum &
Bernstein, P.L.C., Reston, Virginia, of counsel.
Mary B. Graham, and James W. Parrett, Jr. of Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware, John
Allcock, M. Elizabeth Day, William G. Goldman, and
Michael G. Schwartz, of Gray, Cary Ware &
Freidenrich, LLP, Palo Alto, California, of counsel.

MEMORANDUM OPINION
ROBINSON, Chief J.

I. INTRODUCTION

*1 On October 26, 2003, plaintiff Padcom Inc.
("Padcom") filed this patent action alleging
infringement of its United States Patent Nos. 6,418,324
("the '324 patent") and 6,198,920 ("the '920 patent") by
defendants NetMotion Wireless, Inc. ("NetMotion")
and Database Solutions, Inc. ("DSI"). (D.I.1) Padcom
also contends that NetMotion intentionally and
wrongfully interfered with contractual and business
relations with potential customers.

NetMotion has moved to dismiss based on lack of
personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2)
and improper venue under Fed. R. 12(b)(3). (D.I.9) DSI

has moved to transfer the remaining portion of the
litigation to the Northern District of California pursuant
to 28 U.S.C. § 1404(a). FN1 Alternatively, if the court
dismisses NetMotion and declines to transfer the case
against DSI, defendants move to stay this action
pending resolution of the California case. Padcom
opposes the motion (D.I.23, 24) and defendants' have
filed their reply. (D.I.27, 28)

> FN1. On November 7, 2003, NetMotion and
> DSI filed a declaratory action in the Northern
> District of California mirroring the issues
> raised in this action. By order and stipulation
> dated December 10, 2003, the California
> action was stayed pending resolution of this
> first-filed action. *NetMotion Wireless, Inc. v.
> Padcom, Inc.,* 03-cv-04963-MMC,
> (N.D.Ca.2003) (D.I.12). A case management
> conference is scheduled for June 18, 2004.
> (*Id.,* D.I. 19)

II. BACKGROUND

A. The parties

Padcom is a Pennsylvania corporation with its principal
place of business in Bethlehem, Pennsylvania. Founded
in 1989, Padcom is in the business of developing,
making, licensing, selling and servicing software and
hardware products that enhance connectivity for
wireless network uses. (D.I.1) The patent-in-suit relate
to wireless communications and data transfers between
remote devises and host systems. (D.I.10)

NetMotion is a corporation organized under the laws of
Washington with a principal place of business in
Seattle, Washington. (D.I.11) NetMotion is in the
business of designing, developing and selling mobility
software. Mobility software is client/server based
software that extends the enterprise network to the
mobile environment and allows mobile users on both
wide area and local area networks secure access to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

enterprise application and information. (D.I.10) NetMotion's corporate office, research and development facility, and engineering, sales, marketing and manufacturing facilities are all located in Seattle. Of NetMotion's 53 employees, 46 reside in Washington. The other seven employees reside in Ohio, Pennsylvania, Florida, Georgia, Texas, California and Illinois. (D.I.11) NetMotion maintains and supports a web site in Washington. The web site provides: 1) company and product information; 2) partner information; and 3) download information. None of NetMotion's products are available for purchase through its website; however, free trial versions of NetMotion's software are available for download from the web site. (D.I.12)

On February 2, 2001, a predecessor of NetMotion, WRQ, Inc., entered into a Value Added Reseller ("VAR") agreement with DSI. (D .I. 11, Ex. A) DSI is a Delaware corporation with its principal place of business in Cherry Hill, New Jersey. (D.I.13) DSI does not have an office in Delaware. DSI is in the business of providing integrated enterprise applications, databases and network solutions. DSI is a reseller of NetMotion products, however, DSI has never used, manufactured, sold or offered for sale any NetMotion product in Delaware or elsewhere. D.I. 13 ¶ 6) Pursuant to the VAR agreement, NetMotion has agreed to indemnify DSI.

## III. STANDARD OF REVIEW

*2 Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a court may dismiss a suit for lack of jurisdiction over the person. According to the United States Supreme Court,

before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

Omni Capital Intern. Ltd. v. Rudolph Wolff & Co., 484 U.S. 97, 104 (1987). The principle pronounced above

is traditionally described as a two-step analysis: First, whether there is amenability to service and, second, whether the exercise of jurisdiction offends the defendant's right to due process.

Rule 4(e)(1) of the Federal Rules of Civil Procedure states that service of a summons may be effected "pursuant to the law of the state in which the district court is located." The Delaware long-arm statute, 10 Del. C. § 3104(c), has been construed broadly to confer jurisdiction to the maximum extent possible under the due process clause.[FN2] LaNuova D & B S.p.A. v. Bowe Co. Inc., 513 A.2d 764, 768 (Del.1986).

> FN2. According to the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out-of-state accused infringer, the law of the Federal Circuit, "rather than that of the regional circuit in which the case arose," is applicable. Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed.Cir.1995). The Court has instructed that, "in interpreting the meaning of state long-arm statutes, we defer to the interpretations of the relevant state and federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process." Graphic Controls Corp. v. Utah Med. Prods., Inc., 149 F.3d 1382, 1386 (Fed.Cir.1998). The court acknowledges that the Delaware Supreme Court has not collapsed the analysis under the Delaware long-arm statute into the constitutional due process analysis, as some courts have done.

However, since the Delaware Supreme Court has not determined that § 3104(c) is coextensive with federal due process, the court must determine whether the exercise of personal jurisdiction is compatible with both the specific requirements of the Delaware long-arm statute and with defendant's constitutional rights to due process. Intel Corp. v. Silicon Storage Tech., Inc., 20 F.Supp.2d 690, 694 (D.Del.1998); see generally, Int'l Shoe Co. v. Washington, 326 U.S. 310 (1945).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                 Page 3
Not Reported in F.Supp.2d, 2004 WL 1192641 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Once a jurisdictional defense is raised, the burden is on the plaintiff to demonstrate with reasonable particularity that sufficient minimum contacts have occurred with between the forum state and defendant to support jurisdiction. [FN3] *Provident National Bank v. California Federal Savings & Loan Assoc., 819 F.2d 434, 437 (3d Cir.1987).* To meet this burden, the plaintiff must demonstrate either specific or general jurisdiction. Specific jurisdiction arises when the particular cause of action arose from the defendant's activities within the forum state. In contrast, general jurisdiction does not require that the defendant's connections be related to the particular cause of action, but that the defendant has continuous or systematic contacts with the forum state. *American Bio Medica Corp. v. Penisula Drug Analysis Co, Inc ., Civ. No. 99-218-SLR, 1999 WL 615175 (D.Del.1999).*

> FN3. The record reflects that the parties have engaged in limited jurisdictional discovery. (D.I.24, Ex. A, Ex. B)

The Delaware long-arm statute provides that personal jurisdiction is proper over any nonresident who, in person or through an agent:
(1) Transacts any business or performs any character of work or service in the State;
(2) Contracts to supply services or things in this State;
**\*3** (3) Causes tortious injury in the State by an act or omission in this State;
(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;
(5) Has an interest in, uses or possesses real property in the State; or
(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

10 Del. C. § 3104(c). The above provisions have been construed "liberally so as to provide jurisdiction to the maximum extent possible" in order "to provide residents a means of redress against those not subject to personal service within the State." *Boone v. Oy Partek Ab, 724 A.2d 1150, 1156-57 (Del.Super.1997).*

### IV. DISCUSSION

NetMotion argues that its contacts with Delaware are too attenuated to establish either specific or general jurisdiction under Delaware's long-arm statute. (D.I.10)

Padcom asserts that NetMotion is subject to jurisdiction under three sections of the Delaware long-arm statute: § 3104(c)(1), (c)(4) and (c)(3). Padcom argues that § 3104(c)(1) and (c)(4), confer jurisdiction because NetMotion has repeatedly transacted and solicited business in Delaware. Specifically: (1) NetMotion shipped an infringing product to the Wilmington Police Department to enable them to evaluate the product in anticipation of a sale; (2) NetMotion has contacted Delaware residents by mail, email and telemarketing, either cold calling or in response to inquiries about the product; and (3) NetMotion operates a national interactive web site.

In opposition, NetMotion presents the affidavit of its CFO, Bob Colliton. (D.I.12, 28) Colliton avers:
NetMotion maintains and supports a web site in the state of Washington, but none of NetMotion's products are available for purchase through NetMotion's web site. NetMotion's web site offers free trial downloads of its software, as well as white papers that outline the capabilities of NetMotion's software products.
NetMotion has not contacted or otherwise engaged any company in Delaware to download a free trial version of NetMotion's software. NetMotion is aware of one trial download of its software from an entity in Delaware-the Wilmington Police Department. This download was not the result of any targeted or direct marketing on the part of NetMotion. Instead, the Wilmington Police Department was directed to NetMotion's web site through an offer that Hewlett-Packard included in the purchase of certain models of their iPAQ products. In particular, Hewlett-Packard included marketing information on a number of third party products on the installation CD

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1192641 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

for the iPAC. NetMotion was one of the wireless companies that Hewlett-Packard chose to include product information about, with a link to NetMotion's web site for a free trial version of the software. At no time prior to or after this download has any employee contacted the Wilmington Police Department. NetMotion's advertising strategy is national in nature. It is not directed to any particular region, state or company. On occasion, NetMotion has utilized the services of a third party tele-marketing organization to obtain information regarding potential customers. Prospective customers in Delaware may have been contacted by this third party organization.

*4 (D.I.12) He states further that NetMotion has never used, sold, manufactured or offered for sale an accused product in Delaware. In his reply declaration, however, Colliton does acknowledge that in January 2004, NetMotion electronically transmitted its Mobility Connection Newsletter nationwide. Over 12,000 received this material, including 23 entities in Delaware. Nonetheless, Colliton indicates that no revenue was received from the 23 emails. Padcom responds that it is unnecessary to consummate a sale for jurisdictional purposes. *American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.,* Civ. No. 99-218-SLR, 1999 WL 615175 (D.Del.1999). Padcom maintains that NetMotion's activities are part of a general business plan to solicit business in Delaware.

The Delaware Supreme Court has interpreted § 3104(c)(1) as a specific jurisdiction provision that requires a nexus between the cause of action and the conduct used as a basis for jurisdiction. *LaNuova D & B S.p.A. v. Bowe Co.,* 513 A.2d at 768. Section 3104(c)(4) is a general jurisdiction provision that allows the defendants contacts with the forum state to be unrelated to the cause of action. The Federal Circuit has found that when a defendant has "purposefully shipped the accused [product] into [the forum state] through an established distribution channel [n]o more is usually required to establish specific jurisdiction." *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1564 (Fed.Cir.1994).

The record reflects that NetMotion made trial versions of products available on its web site for downloading by

consumers located anywhere. There is no evidence of any restrictions on location of the download. NetMotion likewise placed its products into the stream of commerce by allowing Hewlett-Packard to include marketing information about NetMotion with a link to a free trial version of its software and a link NetMotion couches the relationship with Hewlett-Packward as one-sided, i.e., "Hewlett-Packward chose to include product information", the court interprets this as a mutually beneficial agreement.

The Third Circuit Court of Appeals recently explored the contacts necessary for a court to have specific jurisdiction over a defendant based on the operation of a web site. *Toys "R" Us, Inc., v. Step Two, S.A.,* 318 F.3d 446 (3d Cir.2003). In so doing, the Court acknowledged the traditional jurisdictional rules have to be adjusted to account for new factual scenarios created by the Internet.
Under traditional jurisdictional analysis, the exercise of specific personal jurisdiction requires that the "plaintiff's cause of action is related to or arises out of the defendant's contacts with the forum." Beyond this basic nexus, for a finding of specific personal jurisdiction, the Due Process Clause of the Fifth Amendment requires (1) that the "defendant ha[ve] constitutionally sufficient minimum contacts with the forum," and (2) that "subjecting the defendant to the court's jurisdiction comports with traditional notions of fair play and substantial justice,"

*5 *Id.* at 451 (citations omitted); *see also, Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119 (W.D.Pa.1997) (sliding scale analysis for personal jurisdictional issues in web site cases).

The Third Circuit's test is whether the defendant "intentionally and knowingly transacted business with residents of the forum state, and had significant other contacts with the forum besides those generated by its web site." *Toys "R" Us,* 318 F.3d at 453. There, the Court considered a trademark infringement and unfair competition action filed pursuant to the Lanham Act, 15 U.S.C. § 1501 *et seq.,* and New Jersey state law. The defendant was a Spanish corporation that owns or franchises toy stores in Spain and nine other countries but none in the United States. The defendant lacked any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2004 WL 1192641 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

offices, bank accounts or employees in the United States. Further, the defendant did not direct any advertising or marketing efforts in the United States. The record did reflect that some merchandise for defendant's stores was purchased in the United States. From defendant's Internet web site, consumers could make online purchases; however, the site clearly was intended for users outside of the United States. For example, the price of items was noted in Spanish pesetas and Euros and goods ordered from the site could only be shipped within Spain. The electronic newsletter could be received by anyone with the only requirement being name and email address. In reversing and remanding to the district court on the issue of jurisdictional discovery,[FN4] the Third Circuit recognized that the record was too limited to provide an "occasion to spell out the exact mix of Internet and non-Internet contacts required to support an exercise of personal jurisdiction [,instead,] [t]hat determination should be made on a case-by-case basis by assessing the 'nature and quality of the contacts." ' *Id.* at 453; (quoting *Zippo, 952 F.Supp. at 1127).* Non-Internet factors that a district court should consider are: business trips to the forum state; telephone and fax communications directed to the forum state; purchase contracts with forum state residents; contracts that apply the law of the forum state; and advertisements in local newspapers. *Toys "R" Us,* 318 F.3d at 453-454. Other relevant evidence that might support the exercise of personal jurisdiction is that the defendant purposely and knowingly conducted business in the forum state by directly targeting its web site to the state. *Id.* at 454.

> FN4. The district court denied plaintiff the opportunity to conduct jurisdictional discovery to address the defendant's motion attacking jurisdiction.

In light of this authority, the court finds that NetMotion knowingly conducted business with Delaware residents. Discovery has revealed that the Wilmington Police Department at least tried to use the free trial download of NetMotion's mobility software. (D.I.24, Ex. G) The emails between the Wilmington Police Department reflect correspondence directed to correct problems associated with the use of the trial program in order to

persuade the user to purchase the alleged infringing product. (*Id.*)

**\*6** Using a third party telemarketer, NetMotion contacted Delaware businesses to solicit business and purchases. NetMotion selected seven Delaware entities [FN5] for contact by a third party telemarketer in the summer of 2003. (D.I.24, Ex. A, pgs.61-64) Additionally, NetMotion specifically targeted Delaware health care facilities.[FN6] NetMotion also mailed promotional materials to a targeted market of public safety organizations.[FN7] The documents were mailed to provide information about the products to encourage purchase. (D.I.24, Ex. A, pgs.44-45) If NetMotion did not intend to have Delaware residents as clients, it could have specifically excluded them from tele-marketers and their direct calling list. The fact that the marketing program did not generate sales belie the fact that attempts were made in Delaware, with knowledge and purpose, to do business.

> FN5. The entities were: Dover Police Department, Industrial Affairs Division, Laurel Volunteer Fire Department, New Castle County Police Department, Newark Police-Traffic Division, Delaware State Police, Wilmington Police Department. (D.I. 24, Ex. A p. 61, Ex. K)

> FN6. Alfred I. Dupont Hospital, Bayhealth Medical Center at Kent, Beebe Medical Center, Christiana Hospital, Delaware Hospital-Chronically Ill, Delaware Psychiatric Center, Milford Memorial Hospital, Nanticoke Memorial Hospital, Riverside Health Care Center, Saint Francis Hospital, Stockley Center, and the Wilmington VA Medical Center. (D.I.24, Ex. A, p. 89, Ex. M)

> FN7. These agencies were identified as: Delaware State Police (Dover), Kent County Emergency Communications, Sussex County Emergency Medical Services, New Castle County Police Department, Wilmington Public Safety, Wilmington Police Department, Delaware State Police (Odessa), Delaware

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1192641 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

State Police (Wilmington), Newark Police Department. (D.I.24, Ex. A)

Having found jurisdiction proper under the Delaware long-arm statute, the analysis becomes whether the exercise of jurisdiction comports with the Due Process Clause of the United States Constitution. *See Int'l Shoe Co. v. Washington,* 326 U.S. at 310. Due process mandates that the defendant have certain minimum contacts with the forum state to ensure that the lawsuit does not offend "traditional notions of fair play and substantial justice." *Id.* at 316. In *Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985), the Supreme Court added the further requirement that the minimum contacts be "purposeful" contacts, noting that "even a single act can support jurisdiction" so long as it creates a "substantial connection" with the forum, in contrast to an "attenuated affiliation." *Id.* at 475 n. 18. Further, the Court has directed that courts consider: 1) whether the defendant reasonably could have anticipated being haled into the forum state's court, *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291-293 (1980); 2) the burden imposed on the defendant by litigating in that forum, *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102 (1987); and 3) plaintiff's interest in the forum state, *id.; see also, Provident National Bank v. California Federal Savings & Loan Assoc.,* 819 F.2d at 437 (Third Circuit held that plaintiff must show significantly more than mere minimum contacts to establish general jurisdiction).

As discussed above, the record reflects NetMotion's web site and the marketing promotion by Hewlett-Packward enabled users to download the accused products anywhere, but importantly in Delaware. By targeting businesses in the state, NetMotion knew that its conduct and connections with Delaware were such that they reasonably should have anticipated being brought to this forum.

## V. MOTION TO TRANSFER

DSI has moved to transfer venue from this district to the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a),[FN8] arguing that the declaratory judgment action there provides a

more convenient forum for the litigation. Padcom counters that a plaintiff's choice of forum is the paramount consideration in determining a transfer request. *Wesley-Jessen Corp. v. Pilkington Visioncare Inc.,* 157 F.R.D. 215 (D.Del.1993). NetMotion [FN9] argues that the court should transfer the case to the United States District Court for the District of Washington.

> FN8. Title 28, Section § 1404(a) provides:
> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

> FN9. NetMotion filed a third action in the Superior Court of the State of Washington, King County, alleging that Padcom has tortiously interfered with NetMotion's contracts and business expectancies. *NetMotion Wireless Inc. v. Padcom, Inc.,* 04-cv-622-JCC (W.D. Wa 2004). Padcom removed the matter to the United States District Court for the Western District of Washington on March 24, 2004. (*Id.,* D.I. 1) On April 27, 2004, Padcom moved to transfer to the case to the United States District Court for the District of Delaware or to stay pending resolution of the instant case. (*Id.,* D.I. 8) NetMotion has filed opposition to the transfer motion, to which Padcom has filed a reply. (*Id.,* D.I. 11, 12) On May 4, 2004, Padcom, in the instant action, moved to enjoin prosecution of the subsequently filed action in the Western District of Washington and has requested that the court schedule a Rule 16 Conference. (D.I.33)

*\*7 Congress intended through § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice. *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29 (1988); *Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 208 (D.Del.1998). The burden of establishing the need to transfer rests with the movant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." *Bergman v. Brainin,* 512 F.Supp. 972, 973 (D.Del.1981) (citing *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970), *cert. denied,* 401 U.S. 910 (1971)). "Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail". *ADE Corp. v. KLA-Tencor Corp.,* 138 F.Supp.2d 565, 567 (D.Del.2001); *Shutte,* 431 F.2d at 25.

The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. *C.R Bard, Inc. v. Guidant Corp.,* 997 F.Supp. 556, 562 (D.Del.1998); *Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc.,* Civ. No. 01-199-SLR, 2001 WL 1617186 (D.Del.2001). Although transfer of an action is usually considered as less convenient to a plaintiff if the plaintiff has not chosen its " 'home turf' or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." *In re ML-Lee Acquisition Fund II, L.P.,* 816 F.Supp. 973, 976 (D.Del.1993).

The Third Circuit Court of Appeals has indicated the analysis for transfer is very broad. *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995). Although emphasizing that "there is no definitive formula or list of factors to consider," *id.,* the court has identified potential factors it characterized as either private or public interest. The private interests include: (1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses-but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." *Id.* (citations omitted).

The public interests include: (1) the enforceability of the judgment; (2) practical considerations that could

make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." *Id.* (citations omitted).

\*8 The court is unpersuaded that the private or public interests warrant a transfer. Both plaintiff and defendant DSI are located within close proximity to this court, in Pennsylvania and New Jersey, respectively. Although defendant NetMotion is located in Seattle, Washington, it is a company trying to conduct business on a nationwide basis, including Delaware. Therefore, consistent with the deference afforded a plaintiff's choice of forum as well as the record established on the jurisdictional discovery issue, the court is satisfied that this litigation can be maintained without undue burden to the parties.

## VI. CONCLUSION

For the reasons stated, defendants' motion to dismiss and to transfer (D.I.9) is denied. An order consistent with this memorandum opinion shall issue.

D.Del.,2004.
Padcom, Inc. v. NetMotion Wireless, Inc.
Not Reported in F.Supp.2d, 2004 WL 1192641 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX F

Westlaw.

Slip Copy
Slip Copy, 2006 WL 3242274 (E.D.Pa.)
(Cite as: Slip Copy)

Page 1

**H**

Pierce v. Hayward Industries, Inc.
E.D.Pa.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
M. Frederick PIERCE, et al.
v.
HAYWARD INDUSTRIES, INC., et al.
Civil Action No. 05-5322.

Nov. 6, 2006.

Joseph P. Connor, III, Mary Ellen F. Pina, William J.
Weber, Jr., Connor Weber & Oberlies PC, Paoli, PA,
for M. Frederick Pierce, et al.
Jonathan Dryer, Wilson Elser Moskowitz Edelman &
Dicker LLP, Judith H. Ring, Thomas P. Bracaglia,
Marshall Dennehey Warner Coleman & Goggin, Lois
M. Shenk, Post & Schell, PC, Philadelphia, PA, Francis
P. Manchisi, White Plains, NY, Michael J.Plevyak,
White & Williams LLP, Berwyn, PA, for Hayward
Industries, Inc., et al.

### *MEMORANDUM AND ORDER*
NORMA L. SHAPIRO, S.J.
**\*1** Defendant Alger Manufacturing Comany ("Alger")
has moved to dismiss plaintiffs' complaint under
Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction.
Alger's previous motion to dismiss on the same grounds
was denied without prejudice, so that plaintiffs could
take limited discovery on the question of jurisdiction.
Alger renewed its motion to dismiss after the
completion of that discovery. Alger's motion will be
granted because plaintiffs have not established
sufficient contacts with the Commonwealth of
Pennsylvania or demonstrated that Alger carries on
continuous and systematic business within the state.

### I. Facts

On May 22, 2004, plaintiff M. Frederick Pierce was
seriously injured at his residence in Malvern,
Pennsylvania when his pool filter violently exploded in
his face while he was performing required annual
maintenance work. The pool filter was manufactured by
Alger's codefendant Hayward Industries, Inc. Alger is
a manufacturer of precision machined products,
including a brass sleeve nut that was incorporated in the
Hayward pool filter.

Alger is not a Pennsylvania corporation. It is
incorporated under the laws of the State of California,
and its principal place of business is located in Ontario,
California. (Affidavit of Duane Femrite, Chairman of
the Board and Chief Executive Officer of Alger, Exhibit
1 to Alger's Motion (the "Femrite Affidavit"), ¶ 2).
Alger does not own, use or possess any real property
within Pennsylvania; it does not pay business or other
taxes to Pennsylvania; it does not maintain any offices,
or have any agents or employees, located within the
Commonwealth. (Femrite Affidavit, ¶¶ 6, 8, 9, 10). It
has not consented to the jurisdiction of any
Pennsylvania court. (Femrite Affidavit, ¶ 13).

Alger has had sporadic business contacts with
Pennsylvania over the years. A review of Alger's sales
from 1999 through 2006 showed four sales to a
Pennsylvania company, with the last one made in 2001.
These sales totaled $2,156.93, or approximately
0.001% of Alger's total sales during that period.
(Second Femrite Affidavit, Exhibit C to Alger's Motion,
¶ 6).

The allegedly defective brass sleeve nut, manufactured
by Alger and then incorporated in the Hayward filter,
was not sold to Hayward in Pennsylvania. Alger
maintains, and Pierce does not dispute, that all brass
sleeve nuts sold by Alger to Hayward were shipped to
Hayward's facilities in California or North Carolina, not
to Pennsylvania. (Femrite Affidavit, ¶ 17; James
Hemingway, N.T.41, Exhibit E to Alger's motion).
There is no evidence that Alger knew, at the time it
supplied brass sleeve nuts to Hayward in California in
1998 (when the pool filter was manufactured) that
Hayward distributed products in all 50 states.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2006 WL 3242274 (E.D.Pa.)
**(Cite as: Slip Copy)**

(Stipulation of Counsel, ¶ 2).

During the seven year period from 1999 to 2006, Alger made fifty-eight purchases of goods or services from Pennsylvania totaling $149,303, or approximately $22,000 per year. These purchases amounted to 0.082% of Alger's total sales during that period. (See Femrite Affidavit ¶ 8 and Exhibit D to Alger's Motion). Alger did not directly purchase brass metal used to manufacture the brass sleeve nuts for Hayward from any Pennsylvania vendor. (Stipulation of Counsel, ¶ 1).

**\*2** In addition to these sales and purchases of products, Alger maintains a website, www.alger1.com, that is available to Pennsylvania residents. The website was not used to buy or sell the sleeve nut at issue. It enables users to learn information about the company and to click on a map of Pennsylvania, from which they are then referred to the phone number of an Alger sales representative in California. The website lists sales representatives dedicated to at least 20 states other than Pennsylvania but none for Pennsylvania. Pennsylvania residents can view products offered by Alger and electronically submit prints of specific parts sought to be purchased. They can also apply for employment with Alger online, with a free gift promised for doing so. Products cannot be ordered online and communication can only be initiated through an email link.

## II. *Discussion*

### A. *Standard of Review*

Once a defendant asserts a lack of personal jurisdiction, the burden to prove otherwise is on the plaintiff. *Provident Nat. Bank v. California Fed. Sav. & Loan, Inc.,* 819 F.2d 434, 437 (3d Cir.1987). To satisfy this burden, a plaintiff must establish with reasonable particularity sufficient contacts between the defendant and the forum state. *Mellon Bank (East) PSFS v. Farino,* 960 F.2d 1217, 1223 (3d Cir.1992).

A federal court exercises personal jurisdiction to the extent authorized by the state's long-arm statute. *See* Fed.R.Civ.P. 4(e). Pennsylvania's statute extends

jurisdiction to the fullest extent allowable under the Constitution, 42 Pa. Cons.Stat.Ann. § 5322(b), so the question is whether the exercise of personal jurisdiction over Alger is constitutional. *See Mellon Bank,* 960 F.2d at 1221. Constitutional jurisdiction can be established two different ways: specific jurisdiction and general jurisdiction. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414-16 (1984). Specific jurisdiction is established when the basis of the "plaintiff's claim is related to or arises out of the defendant's contacts with the forum." *Pennzoil Products Co. v. Colelli & Assoc., Inc.,* 149 F.3d 197, 201 (3d Cir.1998) (citations omitted). General jurisdiction does not require the defendant's contacts with the forum state to be related to the underlying cause of action, *Helicopteros.* 466 U.S. at 414, but the contacts must have been "continuous and systematic." *Id* at 416.

Alger contends that Pierce has not met its burden to establish either kind of jurisdiction.

### B. *Specific Jurisdiction*

The Pennsylvania Long Arm statute, 42 Pa.C.S.A. § 5322, provides that specific jurisdiction can be exercised over a defendant who "transact[s] any business" in Pennsylvania or "caus[ed] harm or tortious injury in [Pennsylvania] by an act or omission outside of [Pennsylvania]." In deciding whether specific personal jurisdiction is appropriate, a court must first determine whether the defendant had the minimum contacts with the forum necessary to have reasonably anticipated being haled into court there. *Pennzoil,* 149 F.3d at 201, citing *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980). Second, assuming minimum contacts have been established, a court may inquire whether the assertion of personal jurisdiction would comport with traditional conceptions of fair play and substantial justice. *Pennzoil,* 149 F.3d at 201, citing *Burger King Corporation v. Rudzewicz,* 471 U.S. 462, 476 (1985); *International Shoe Co. v. Washington,* 326 U.S. 310, 320 (1945). The first step is mandatory but the second step is discretionary. *See Pennzoil,* 149 F.3d at 201.

**\*3** In addition to direct sales of products into a forum

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

state, a defendant may create the minimum contacts necessary for a court to assert specific jurisdiction by placing a product into the "stream of commerce," which through a chain of distribution finds its way into the forum state. *See Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102 (1987); *Renner v. Lanard Toys Ltd.,* 33 F.3d 277, 279 (3d Cir.1994). In its plurality opinion, the Supreme Court in Asahi proposed three separate tests for establishing stream of commerce jurisdiction. One test is whether any conduct by a defendant shows an intent to serve the market in the forum state. *Id.* at 112 (O'Connor, J.). A second test requires demonstration of an awareness that the final product is marketed in the forum state in the "regular and anticipated flow of products". *Id.* at 117 (Brennan.J., concurring). A third test would evaluate the volume, value and hazardous nature of the goods entering the forum state. *Id.* at 122 (Stevens, J., concurring).

Our Court of Appeals has not yet adopted any of the three stream of commerce tests announced in *Asahi. See Pennzoil,* 149 F.3d at 205; *Renner,* 33 F.3d at 281-82; *Affatato v. Hazet-Werk,* 2003 WL 22797786 (E.D.Pa. Nov. 19, 2003). However, it has made clear that a defendant must have engaged in some form of "purposeful availment" of the laws of the forum state. *Cf. Pennzoil,* 149 F .3d at 207 (purposeful availment found where defendant sold sixty percent of two grades of oil to Pennsylvania refineries; defendant knew the oil was going to Pennsylvania; and defendant was designing a product for the Pennsylvania market); *with Renner,* 33 F.3d at 283 (no purposeful availment by Hong Kong toy manufacturer in merely placing product, F.O.B. Hong Kong, into the stream of commerce).[FN1]

> FN1. The Court of Appeals in *Renner* found the record regarding "purposeful availment" was ambiguous and remanded for further proceedings. 33 F.3d at 284.

Pierce argues that specific jurisdiction under the "stream of commerce" theory is present because (1) component parts Alger sold to Hayward were incorporated in the Hayward pool filter; (2) Hayward is

an international corporation making regular sales in Pennsylvania (3) Hayward has authorized dealers in Pennsylvania; (4) Hayward has sales in excess of $500 million and over 1,500 employees; and (5) Hayward products are marketed worldwide. Pierce concedes there is no evidence that Alger knew, at the time it supplied the brass sleeve nut to Hayward, that Hayward distributed its products to all 50 states (Stipulation, ¶ 2). The facts cited by Pierce may establish personal jurisdiction over Hayward because of its distribution of products in Pennsylvania, but they are not sufficient to establish jurisdiction over Alger. Mere forseeability that the defendant's products may end up in the forum state is not sufficient for "stream of commerce" jurisdiction. *Pennzoil,* 149 F.3d at 203. The defendant must have demonstrated some "purposeful availment" of the laws of the forum state. *Id.*

No such purposeful availment has been shown here. The sleeve nut in question was not sold in Pennsylvania, and no other Alger sleeve nuts were sold to Pennsylvania businesses. Alger's other sales to Pennsylvania were very insignificant and sporadic. Although Alger's sleeve nuts, after incorporation in Hayward's products, entered Pennsylvania through a chain of distribution, this fact alone is insufficient to exercise personal jurisdiction under any of the three stream of commerce tests announced in *Asahi.* Apart from its website, Alger did not exhibit any conduct showing an intent to service the Pennsylvania market. There was no evidence of the regularity of Alger's sleeve nut in Hayward's filters reaching Pennsylvania. There was no evidence of the volume and value of Alger's sleeve nuts reaching Pennsylvania through incorporation in Hayward pool filters. The sleeve nut was not hazardous by nature. Pierce has not established sufficient minimum contacts with Pennsylvania to show that it could have reasonably anticipated being sued here or that any of the three *Asahi* tests for the exercise of specific jurisdiction have been met.

### C. *General Jurisdiction*

*4 Pursuant to Pa.C.S.A. § 5301(2), general jurisdiction can be exercised over a corporation in Pennsylvania if the corporation: (a) is incorporated in Pennsylvania; or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(b) has consented to jurisdiction; or (c) carries on a continuous or systematic part of its general business in Pennsylvania. Whether Pierce can establish general jurisdiction depends on whether Alger has carried out continuous and systematic business within Pennsylvania. *See Helicopteros,* 466 U.S. at 416; *Provident,* 819 F.2d at 437. Numerous factors are used to assess the level of contacts, including the maintenance of offices, location of assets or employees within the forum state, as well as direct advertising and sales in the forum state. *See Hlavac v. DGG Props.,* 2005 WL 839158, at *3 (E.D.Pa. Apr. 8, 2005); *see also Corporate Aviation Concepts, Inc. v. Multiservice,* 2003 WL 22794693, at *3 (E.D.Pa. Nov. 13, 2003) (listing factors). The amount of business conducted in the state is less important than the nature of defendant's business in the state, that is, whether the business dealings are central to the defendant's business and how frequently such dealings occur. *Cf. Provident,* 819 F.2d at 438 (California bank's maintenance of controlled disbursement account at a Pennsylvania bank, with daily accounting of monies, constituted "substantial, ongoing, and systematic activity in Pennsylvania," because it was a central part of the defendant's business, even though less than 1% of defendant's loans and deposits originated in Pennsylvania); with *Modern Mailers, Inc. v. Johnson & Quin, Inc.,* 844 F. Supp 1048, 1053-54 (E.D.Pa.1994) ($231,000 of direct sales to Pennsylvania, less than 1% of Illinois company's sales, was not sufficient to establish jurisdiction because the sales were not central to defendant's business and did not involve substantial continuous regular contact).

Pierce concedes that Alger's sales to Pennsylvania are de minimis (Pierce Response, Brief at 14), so it does not rest its claim to jurisdiction on such sales. Pierce instead contends that Alger carries on a "continuous and systematic part of its business" in Pennsylvania by its *purchases* of raw materials from Pennsylvania vendors and by its maintenance of an interactive website.

### a. Purchases of Products

Alger's purchases from Pennsylvania vendors totaled only $149,303, less than $22,000 per year or 0.082% of Alger's cumulative sales during that period. Pierce counters that in 2001 alone, Alger purchased 109,000 pounds of raw brass from Pennsylvania vendors. This may seem like a large quantity without context, but Alger's website declares purchases of 10,000,000 pounds of raw materials annually, so the Pennsylvania purchases would constitute only 1% of total annual purchases. Even if there were a significantly larger volume, "mere purchases, even if occurring at regular intervals, are not enough to warrant a state's assertion of *in personam* jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Helicopteros,* 466 U.S. at 418 (Columbian corporation's purchases of 80% of its helicopters from Texas and $4,000,000 worth of parts did not constitute systematic and continuous contacts necessary to establish general personal jurisdiction). [FN2]

> FN2. The *Helicopteros* holding was limited to foreign corporations, but the Supreme Court relied on, and did not overrule, the previous case of *Rosenberg Bros. & Co. v. Curtis Brown Co.,* 260 U.S. 516 (1923) (Brandeis, J.), in which purchases and related trips were deemed insufficient to support personal jurisdiction.

### b. Alger's Website

*5 Pierce also contends that Alger's website demonstrates its continuous and systematic business operations in Pennsylvania. There is no allegation that the brass used in the allegedly defective sleeve nut was purchased over the internet or that the sleeve nut was sold via the internet so that the exercise of specific jurisdiction would be appropriate. The website is relevant only if it demonstrates evidence of sufficient continuous business to establish general jurisdiction over Alger.

Since the advent of the internet, which allows easy communications, commerce, and general transactions across state lines, courts have struggled to address jurisdictional issues arising from these electronic activities. To the extent that a direct solicitation or contractual agreement sent via email directly leads to a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3242274 (E.D.Pa.)
**(Cite as: Slip Copy)**

Page 5

civil action, jurisdiction is readily exercised. Actions involving domain names that infringe on trademarks, or companies that offer purely (or primarily) internet-based services are also straightforward; jurisdiction and interstate activities are central to the case, so the exercise of specific jurisdiction is warranted. In personal injury cases, plaintiffs have attempted to assert general personal jurisdiction over non-resident defendants based solely on the existence of a defendant's website having nothing to do with the alleged injury. Because a website is always available, it is likened to "continuous and systematic" activity in the forum state.

A leading case regarding personal jurisdiction based on a website is *Zippo Mfg. Co. v. Zippo Dot Com. Inc.,* 952 F.Supp. 1119 (W.D .Pa.1997), in which the district court established a sliding scale test, with personal jurisdiction found to be appropriate if a website was "interactive" but not if the website was "passive". In *Zippo,* a manufacturer of lighters had sued a California company for trademark infringement after it registered a series of domain names that included the plaintiff's trademark. The defendant used the domain names in its website newsgroup postings. The court held that personal jurisdiction was proper because the California company had about 3,000 Pennsylvania subscribers who regularly downloaded messages containing the purported trademark infringements. Purposeful availment was established by the processing of applications from Pennsylvania residents and the assignment of passwords to the web site. The alleged trademark infringements were deemed to have occurred in Pennsylvania when local residents viewed the site, and the state was found to have a substantial interest in protecting the trademarks of its residents.

Our Court of Appeals considered personal jurisdiction in another trademark case based on an infringing website in *Toys "R" Us,* 318 F.3d at 446. The Court discussed the "sliding scale" approach of *Zippo* and called it the "seminal authority" on these types of cases. *Id.* at 452. It held that "the mere operation of a commercially interactive web site should not subject the operation to jurisdiction anywhere in the world. Rather, there must be evidence that the defendant 'purposefully availed' itself of conducting activity in the forum state,

by directly targeting its web site to the state, knowingly interacting with residents of the forum state via its web site, or through sufficient other related contacts." *Id.* at 454.[FN3]

> FN3. Ultimately, the court determined that further discovery was necessary to determine whether there was purposeful availment. *Id* . at 455.

**\*6** While *Zippo* offers a simple test for courts to follow based on the level of website interactivity, interactivity is not the only consideration, especially in a personal injury case where the website is unrelated to the cause of action. *See generally* Dennis T. Yokoyama, *You Can't Always Use the Zippo Code: The Fallacy of a Uniform Theory of Internet Personal Jurisdiction,* 54 DePaul L.Rev. 1147 (2005) (evaluating courts' adoption of the *Zippo* test). Courts have shown a reluctance to exercise personal jurisdiction based solely on a website and have looked at interactivity along with other factors. Three Eastern District of Pennsylvania decisions are instructive.

In *O'Connor v. Sandy Lane Hotel Co.,* 2005 WL 994617 (E.D.Pa. Apr. 28, 2005) (Joyner, J.), the court found that the defendant hotel in Barbados was not subject to general jurisdiction in a personal injury case despite the fact that it operated a website accessible to Pennsylvania residents. "[M]uch like an in-print advertising campaign, the website must either be 'central' to the defendant's business in the forum state or specifically target residents of the forum state." *Id.* at *3 (citing *Snyder v. Dolphin Encounters,* 235 F.Supp.2d 433, 440-41 (E.D.Pa.2002).

In *Hlavac v. DGG Properties,* 2005 WL 839158 (E.D.Pa. Apr. 8, 2005) (Yohn, J.), the defendant, a Connecticut resort, operated a website through which visitors could purchase gift certificates and inquire about reservations but not book online. Plaintiffs claimed they would not have chosen the resort but for the website. Using the *Zippo* test, the court determined that the resort's website was not sufficiently interactive to justify general jurisdiction, and the ability to purchase gift certificates was insufficient because

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3242274 (E.D.Pa.)
**(Cite as: Slip Copy)**

Page 6

plaintiffs had not alleged any facts suggesting that gift certificates were "central to defendants' business." *Id.* at 6. The court also found the exercise of general jurisdiction to be inappropriate because the website was not designed specifically to reach customers in Pennsylvania. *Id.,* citing *Molnlycke Health Care AB v. Dumex Med. Surgical Prods., Ltd.,* 64 F.Supp.2d 448 (E .D.Pa.1999) and *Toys "R" Us,* 318 F.3d at 446.

In *Snyder v. Dolphin Encounters Ltd.,* 235 F.Supp.2d 433 (E.D.Pa.2002) (Brody, J.), personal jurisdiction was found lacking over a Bahamian corporation despite the fact that it received 5% of its website information requests from Pennsylvania and 3% of its overall requests from Pennsylvania. The court reasoned that the contacts were "insufficient to comprise the continuous and systematic contacts necessary to establish personal jurisdiction." *Id.* at 438. Considering the *Zippo* formulation and citing *Molnlycke,* the court also found that the website was not sufficiently interactive to establish general jurisdiction, even though it included an on-site order form, an on-site "ask the trainer" form, an on-site souvenir order form, and an on-site page allowing correspondence with management personnel (accessed more than 1,400 times by Pennsylvania IP addresses). *Id.* at 440. The court found that the websites were not targeted specifically to Pennsylvanians and were not central to the defendant's business in Pennsylvania. *Id.* at 440-41. *See also Horizon Aggressive Growth, L.P. v. Rothstein Kass, P.A.,* 421 F.3d 1162 (11th Cir.2005) (requiring "connexity" between the out-of-state communications and the cause of action).

**\*7** There is an understandable judicial reluctance to extend the traditional limits on the exercise of personal jurisdiction over defendants based solely on a website accessible from the forum state. Whether the site is deemed not interactive enough, not targeted toward the forum state, not central to the defendant's business, or simply having no "connexity" to the cause of action, courts have resisted asserting general jurisdiction in these circumstances. Pierce's counsel contends that the decisions in *Mar-Eco, Inc. v. T & R & Sons Towing & Recovery, Inc.,* 2003 Pa.Super. 444, 837 A.2d 512 (2003) and *Gammino v. SBC Communs., Inc.,* 2005 U.S. Dist. LEXIS 5077 (E.D.Pa. March 29, 2005)

support the exercise of jurisdiction based on Alger's website. Both of these cases are distinguishable. First, neither is a personal injury case. [FN4] Second, using the *Zippo* analysis, both websites had elements of substantial interactivity. The website in *Mar-Eco* was highly interactive, as it enabled one to complete nearly an entire vehicle purchase transaction on the site; the *Gammino* website linked Pennsylvania residents to a subsidiary's highly interactive website, Cingular Wireless.

> FN4. *Mar-Eco* was an action for unjust enrichment against a Maryland motor vehicle dealer for failing to record timely the Pennsylvania dealer's interest in vehicles sold. *Gammino* was a patent infringement case.

The Alger website is not highly interactive, and users can only initiate a communication through an email link or an online employment form. Users can click on a map of Pennsylvania, but they are then referred to the number of an Alger sales representative in California. A prospective employee can apply for a job online, and a free gift is promised to users who submit an application on line. Pierce makes much of a potential customer's ability to send prints over the internet, or the ability to apply for employment online, but there is no transaction, purchase or sale, that can be consummated by means of the website. Under the *Zippo* analysis, the website is not sufficiently interactive to support a finding of personal jurisdiction.

In addition, there is no connection between the website and the cause of action here. The website does not demonstrate a "conscious choice to conduct business with the residents" of Pennsylvania and "intentionally interact with [Pennsylvanians] via the web site in order to show purposeful availment ..." *Toys "R" Us,* 318 F.3d at 446. The website is not targeted specifically to reach Pennsylvanians and is not central to the defendants's business in Pennsylvania. *See Molnlycke Health Care,* 64 F.Supp.2d at 448. No sales are conducted by means of the web. Users cannot link to a specific sales representative for Pennsylvania but are instead routed to an email link for Alger's headquarters in California. The capabilities that are offered, *ie* ., the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ability to send prints, view product lines and submit employment applications, are simply not enough to find that the exercise of personal jurisdiction is warranted. As Judge Brody stated, "[a] passive website that does little more than provide information is not grounds for the exercise of personal jurisdiction ... If the contacts at issue here establish general personal jurisdiction, then any corporation with websites like [defendant's] would be subject to general jurisdiction in every state." *Snyder v. Dolphin Encounters Limited,* 235 F.Supp.2d at 441. The same is true here.

### III. Conclusion

*8 For the reasons discussed above, Alger's motion to dismiss for lack of personal jurisdiction is granted. An appropriate Order follows.

### ORDER

AND NOW, this 6th day of November, 2006, upon consideration of Alger Manufacturing Company's Renewed Motion To Dismiss for Lack of Jurisdiction and the plaintiffs' response thereto, it is **ORDERED** that:

1. Alger's Motion To Dismiss for Lack of Jurisdiction (Paper # 221) is **GRANTED.**

2. Alger's Motion for Leave to File a Reply (Paper # 227) is **DENIED** as moot.

E.D.Pa.,2006.
Pierce v. Hayward Industries, Inc.
Slip Copy, 2006 WL 3242274 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX G

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 898131 (D.Colo.)
**(Cite as: Not Reported in F.Supp.2d)**

H

Competitive Technologies, Inc. v. Carolina Liquid
Chemistries Corp.
D.Colo.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Colorado.
COMPETITIVE TECHNOLOGIES, INC., a
Delaware corporation, Plaintiff,
v.
CAROLINA LIQUID CHEMISTRIES
CORPORATION, a Delaware corporation,
Defendant
**No. CIVA05CV01678PSFCBS.**

April 4, 2006.

Kourtney Marie Mueller, Robert C. Marshall, Amanda
J. Tessar, Glenn K. Beaton, Gibson, Dunn & Crutcher,
LLP, Denver, CO, for Plaintiff.
Natalie Marie Hanlon-Leh, Nina Y. Wang, Faegre &
Benson, LLP, Denver, CO, for Defendant.

ORDER ON DEFENDANT'S CORRECTED
MOTION TO DISMISS FOR LACK OF
PERSONAL JURISDICTION AND IMPROPER
VENUE, OR IN THE ALTERNATIVE, TO
TRANSFER VENUE
FIGA, J.
*1 This matter comes before the Court on Defendant's
Corrected Motion to Dismiss, or in the Alternative,
Motion To Transfer Venue (Dkt.# 17), filed October
13, 2005. The motion references a declaration of Philip
Shugart, President and founder of Defendant Carolina
Liquid Chemistries Corporation ("Carolina
Chemistries"), which was filed on October 11, 2005
together with defendant's original motion to dismiss
(Dkt.# 12).

On January 3, 2006, this Court entered an order
denying defendant's motion to stay this litigation
pending a decision by the United States Supreme Court
in a case involving the same patent at issue in this case

(Dkt.# 38). In its order the Court directed the parties to
complete the discovery they had scheduled relating to
the jurisdictional issues and complete the briefing on
the issues raised in the motion to dismiss (Order at 4-5).
On January 30, 2006, Plaintiff Competitive
Technologies, Inc. ("CTI") filed, under seal, its
Opposition to Defendant's Corrected Motion, together
with Exhibits A through R (Dkt.# 41). On February 14,
2006, defendant filed under seal its reply to plaintiff's
response, together with attachments including a further
declaration of Shugart, a declaration of Sandra Strauss,
and other documents marked as Exhibits A-6 through
A-10 (Dkt.# 49). On February 17, 2006, plaintiff filed
a motion for leave to file a surreply brief in support of
its opposition to the motion to dismiss (Dkt.# 52),
which was granted on February 21, 2006 (Dkt.# 53). On
the same date, plaintiff's surreply brief, tendered with its
motion for leave to file, was deemed filed together with
Exhibits A through G attached thereto (Dkt.# 54).

On March 8, 2006, defendant submitted a filing titled
"Unopposed Motion for Leave to File Plaintiff's
Corrected Response In Opposition to Defendant's
Corrected Motion to Dismiss and Plaintiff's Reply
Under Seal, With Provision for Filing of Redacted
Public Versions." (Dkt.# 60). Despite its verbose and
nearly incomprehensible title, this motion is apparently
a motion to have certain portions of the previously filed
briefs and exhibits kept under seal or have a redacted
version substituted. The motion was granted by the
Magistrate Judge on March 15, 2006 and the Clerk of
the Court was instructed to accept for filing redacted
versions of Plaintiff's Response to the Motion to
Dismiss and Defendant's Reply (Dkt.# 62). These
procedures having been completed, the motion is now
ripe for determination.

BACKGROUND

Plaintiff CTI filed its complaint in this action on August
29, 2005 (Dkt.# 1), alleging one claim for relief against
defendant for direct or indirect patent infringement,
contributorily or by inducement, arising from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 898131 (D.Colo.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

defendant's sale or offers for sale of its homocysteine test kits (Complaint ¶ 16). Plaintiff alleges that defendant is a Delaware corporation with a place of business in Brea, California (*id.* at ¶ 2) but also alleges that defendant distributes the infringing product throughout the United States, including into the State of Colorado (*id.* at ¶ 4). Thus, plaintiff asserts venue in this district is proper pursuant to 28 U.S.C. §§ 1391 and 1400.

**\*2** The essence of plaintiff's complaint appears to be that defendant is in the business of marketing and selling kits used for medical testing and assaying bodily fluids, at least one of which measures a patient's level of homocysteine. According to plaintiff, elevated levels of homocysteine may indicate conditions associated with cardiovascular disease (Complaint at ¶¶ 6, 9). Defendant alleges that it is the owner of U.S. Patent No. 4,940,658 (the " '658 patent"), which according to plaintiff covers in part a method for detecting or treating a deficiency of cobalamin or folate by assaying body fluid for elevated levels of homocysteine (*id.* at ¶ 13). As stated above, plaintiff avers that the test kits offered for sale by defendant infringe upon its '658 patent. (*Id.* at ¶ 16).

## DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

Defendant argues that plaintiff's complaint should be dismissed for lack of personal jurisdiction over it, or for lack of venue, in the District of Colorado. Alternatively, defendant requests that venue of this case be transferred to the Central District of California, where defendant has its principal place of business (Motion at 10).

Defendant asserts that jurisdiction under the Colorado long-arm statute does not lie here because none of its alleged activities giving rise to this case occurred in Colorado, as it "is not aware of any homocysteine assay sold or used by any customer in Colorado in either 2004 or 2005" (*id.* at 4). Relying on the affidavit of its President and founder, Philip Shugart, defendant states that while it has sold "instruments and reagents to customers in Colorado" the volume of sales is a small dollar amount ($5,139 in 2005 and $704 in 2004) and

none of the sales were for homocysteine assay (Schugart Affidavit at ¶¶ 4-6). The Shugart affidavit also states that defendant has no property, offices, employees or salespeople in Colorado, and has never sent an employee or agent to Colorado (*id.* at ¶¶ 7-9). Thus, the affidavit states that defendant "has never conducted any type of program in Colorado" and "does not regularly conduct business in Colorado." *Id.* at 10-11.

Defendant also asserts that venue of this case does not lie in Colorado because its documents, files, archives, most of its witnesses, and all of its service representatives who market homocysteine assay are located in California (*id.* at 12-14). Shugart also states that he is "not aware of any witness residing in Colorado whom [defendant] might call as a witness in this action". He also states that he believes "the evidence will show that the development of the homocysteine test kits ... at issue in this case took place in California and not" in Colorado (*id.* at 17-18).

### PLAINTIFF'S RESPONSE

Plaintiff responds that there is no dispute that defendant is a supplier of laboratory test kits some of which are used to assay for homocysteine by a method that allegedly infringes the '658 patent. Plaintiff describes defendant as "a holdout in the industry in its refusal to take a license to this patent." (Plaintiff's Response at 4).

**\*3** Plaintiff further argues that discovery taken in the case shows that defendant markets and sells its products in Colorado, and offers the homocysteine assay kit for sale in Colorado, although it may not have concluded any sales of that product in the state (Plaintiff's Response at 4-5). With respect to its assertion of specific jurisdiction, plaintiff claims that defendant has sent direct mail pieces to Colorado companies offering the homocysteine test kits (*id.* at 7 and Exhibits E, F. G and H thereto). Plaintiff further contends that defendant's sale representatives have made telephone calls or sent email and faxes to at least eight companies offering to sell the homocysteine test kits as reflected in sales contact sheets (*id.* at 7 and Exhibit I thereto). Plaintiff also asserts that defendant has sent several cost

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 898131 (D.Colo.)
**(Cite as: Not Reported in F.Supp.2d)**

quotes for the kits to Colorado companies (*id.*). Defendant also apparently operates a website accessible in Colorado, although there is a dispute over whether customers may place orders for products online (*cf.* Plaintiff's Response at 9 with Defendant's Reply at 7-8 and Second Shugart Affidavit, attached thereto, at ¶ 3). Plaintiff asserts that the website was altered after this case was filed so as to delete the "order form" portion which had appeared on the former website (Plaintiff's Surreply at 5-6).

### APPLICABLE LEGAL STANDARDS

Once a court's personal jurisdiction over a defendant has been challenged, "the plaintiff has the burden of proving jurisdiction exists." *Wenz v. Memery Crystal, 55 F.3d 1503, 1505 (10th Cir.1995).* When a district court rules on a F.R.Civ.P. 12(b)(2) motion to dismiss for lack of personal jurisdiction based on affidavits and other written materials, as in this case, the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion. *OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1091 (10th Cir.1998); Kuenzle v. HTM Sport-Und Freizeitgeräte AG, 102 F.3d 453, 456 (10th Cir.1996).*

In deciding such a motion to dismiss, "[t]he allegations in the complaint must be taken as true to the extent that they are uncontroverted by the defendant's affidavits." *Kennedy v. Freeman, 919 F.2d 126, 128 (10th Cir.1990).* When the parties present conflicting affidavits, "all factual disputes are resolved in the plaintiff's favor and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Id.; see also Ten Mile Indus. Park v. W. Plains Serv. Corp., 810 F.2d 1518, 1524 (10th Cir.1987).* "In order to defeat a plaintiff's prima facie showing of jurisdiction, a defendant must present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.' " *OMI Holdings, 149 F.3d at 1091* (quoting *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).*

This is a patent case, and therefore this Court is bound to apply the law of the Federal Circuit. The case law of

that circuit recognizes the exercise of personal jurisdiction over a nonresident defendant if the relevant state's long-arm statute permits the assertion of jurisdiction without violating federal due process. *See 3d Systems Inc., v. Aarotech Lab's, Inc., 160 F.3d 1373, 1376-77 (Fed.Cir.1998).* The parties here agree that the availability of personal jurisdiction is determined in accordance with Colorado's long-arm statute, C.R.S. § 13-1-124 *et seq.* (Defendant's Motion at 2-3; Plaintiff's Response at 5-6). That statute "extend[s] the personal jurisdiction of Colorado courts to their maximum limits permissible under the United States and Colorado Constitutions." *Scheuer v. District Court, 684 P.2d 249, 250 (Colo.1984).*

### ANALYSIS

#### A. Motion to Dismiss For Lack of Personal Jurisdiction

**\*4** In this case, plaintiff argues that defendant is subject to specific jurisdiction in Colorado (Plaintiff's Response at 7-8). "Specific jurisdiction exists when a non-resident defendant purposefully establishes minimum contacts with the forum state, the cause of action arises out of those contacts, and jurisdiction is constitutionally reasonable." *3-D Systems, Inc., 160 F.3d at 1378* again citing to *Burger King Corp. v. Rudzewicz.* The federal circuit cites a three-pronged minimum contacts test: (1) whether the defendant purposefully directed its activities at residents of the forum, (2) whether the claim arises out of or relates to those activities, and (3) whether assertion of personal jurisdiction is reasonable and fair. *3-D Systems, Inc., supra, 160 F.3d at 1378* citing to *Akro v. Luker, 45 F.3d 1541, 1545-46 (Fed.Cir.) cert. denied, 515 U.S. 1122, 115 S.Ct. 2277, 132 L.Ed.2d 281 (1995).*

In *3-D Systems,* as in the instant case, the defendant was accused of making offers to sell the infringing product in the state (California) where jurisdiction was sought to be established even though there was no evidence of defendant's personnel actually engaging in sales activities in California, or even of any California sale. The evidence revealed that the defendant had sent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 898131 (D.Colo.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

solicitations and price quotation letters for orders into California, had responded to e-mail requests for information, and had mailed promotional materials into California. 160 F.3d at 1378. On these facts the Federal Circuit panel found sufficient facts to support the exercise of specific jurisdiction in California. _Id._ at 1380.

In considering the second prong of the three-pronged test, the panel in _3-D Systems,_ a case upon which plaintiff relies, found that the price quotation letters sent by the alleged infringer constituted "offers to sell" within the meaning of 35 U.S.C. § 271(a),[FN1] and "to treat them as anything other than offers to sell," notwithstanding disclaimers to that effect, "would be to exalt form over substance." _Id._ at 1379. Defendant here argues that the rationale of _3-D Systems_ cannot apply to it.

> FN1. 35 U.S.C. § 271(a) provides, in pertinent part, "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States ... infringes the patent." As explained in _3-D Systems, supra,_ the "offer to sell" language was added to the statute in 1994. 160 F.3d at 1378.

Citing to cases decided after _3-D Systems,_ Defendant Carolina Chemistries argues that an offer to sell, which is to be determined under contract law, is only made when the offeree has the power to accept the offer (Defendant's Reply at 4). Defendant here asserts that contrary to plaintiff's assertions, it merely engaged in limited "product promotion" within the forum state, and that its direct mail pieces and cost quotes for homocysteine kits did not amount to offers to sell to customers in Colorado because the terms of sale were not included (_id._). The second declaration of Mr. Shugart states that defendant's website permits users to contact defendant, but "does not possess the functionality to permit internet users to actually place orders." (Second Declaration of Shugart at ¶ 3, attached to Defendant's Reply Brief (Dkt.# 49)). Defendant argues that such activities are "too indefinite" to constitute offers to sell (_id._ at 4-5).

**\*5** Plaintiff asserts in its surreply that the defendant's website was only recently modified to eliminate the order form that was part of the website, and prior to the alteration defendant did offer the infringing product for sale in Colorado over the website (Plaintiff's Surreply at 5-6). Plaintiff asserts that Exhibit 3 to its surreply is a printout of the order form from defendant's website before it was modified. It certainly appears to permit the ordering of defendant's products, and among the products available for order is the homocysteine kit (_see_ Exhibit 3 to Plaintiff's Surreply at 3). Defendant has not refuted these apparent facts.

In _Wise v. Lindamood,_ 89 F.Supp.2d 1187 (D.Colo.1999), Chief Judge Babcock, in considering whether general personal jurisdiction existed in Colorado in a copyright infringement action, drew a distinction between the operation of an interactive website and a "passive" or "moderately interactive" website, finding that either alone is "insufficient to confer general personal jurisdiction. 89 F.Supp.2d at 1194. He stated, however, that "an 'interactive' Web site, together with other contacts, can meet the minimum jurisdictional threshold." _Id._ Chief Judge Babcock found that the defendant's operation of what he described as a "moderately interactive" website, coupled with other contacts supplied sufficient grounds to exercise general personal jurisdiction.

In _Boppy Co. v. Luvee Products Corp.,_ 72 U.S.P.Q.2d. 1577 (D.Colo.2004), Judge Krieger of this district further discussed the evolving distinction between "interactive" and "passive" websites for purposes of establishing minimum contacts. _See_ 72 U.S.P.Q.2d. at 1579-80. Judge Krieger found that a website that allows "users to browse available fabric choices and place on-line orders, ... functions much like a physical store" and provides minimum contacts under the relevant test. While Judge Krieger ultimately found a lack of personal jurisdiction over the defendant, that was due to the absence of any other business activities in Colorado besides the one sale in the state to the plaintiff's attorney. _Id._ at 1580-81.

In the instant case, resolving the asserted conflict in favor of the plaintiff as this Court must do, the facts appear to show that defendant at least for a time

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 898131 (D.Colo.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

operated an interactive or moderately interactive website that allowed customers to order the alleged infringing product. In addition, defendant otherwise seeks to, and does in fact, conduct business in the State of Colorado by generally promoting and selling its products here, and by specifically promoting the homocysteine kits by direct mailing, telephone and email contacts, even if such communications themselves do not constitute "offers to sell." Thus, this Court, finds that the first two prongs of the test for personal jurisdiction are met here-the defendant purposefully directed its activities at residents of the forum and the plaintiff's infringement claim arises out of or relates to those activities.

*6 Defendant argues even if the requisite minimum contacts with Colorado are found here, assertion of personal jurisdiction over it in Colorado is nonetheless not reasonable and fair (Defendant's Motion at 6-9). Once a plaintiff has made a prima facie showing of sufficient minimum contacts to support jurisdiction, a court must then consider whether the exercise of personal jurisdiction "offends 'traditional notions of fair play and substantial justice." ' *OMI Holdings*, 149 F.3d at 1091 (quoting *Asahi Metal Industry Co. v. Superior Court of Cal.*, 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). As stated in *3-D Systems, supra*, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, it must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable, citing to *Akro* quoting from *Burger King*, 160 F.3d at 1380.

Five factors are relevant to this inquiry: 1) the burden on the out-of-state defendant; 2) the forum state's interest in resolving the dispute; 3) the plaintiff's interest in receiving convenient and effective relief; 4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and 5) the shared interest of the several states in furthering fundamental social policies. *OMI Holdings*, 149 F.3d at 1095.

Here, defendant essentially argues three of these factors: 1) that litigating in Colorado is a "burden" and Colorado is not a convenient forum because defendant's

personnel, records and witnesses are located in California; 2) that Colorado has no special interest in this dispute so as to justify having the case proceed in this district (Defendant's Motion at 7-8), and 3) that plaintiff has no special interest in litigating this dispute in Colorado. *Id.* at 8.

With respect to the first factor, this Court notes that defendant has availed itself of the right to pursue business in Colorado and any burden placed upon it to litigate here is part of the obligation connected to doing business in this state. As plaintiff argues, exercise of personal jurisdiction in Colorado is not unreasonable, for defendant has sought to avail itself of sales opportunities in Colorado, as presumably it has in other states. The fact that defendant has not made a sale in the District of Colorado is not for lack of trying. That does not render jurisdiction in Colorado any more unfair than in any other state where it has made offers but may not have consummated a sale. If defendant's approach were correct, a mail order business or website operator could only be sued in the state where it is located, despite engaging in business elsewhere.

Moreover, contrary to defendant's suggestion, plaintiff has not randomly picked Colorado as its venue. First, it has previously litigated this very patent in the District of Colorado. Second, it appears that the patent at issue was developed at the University of Colorado Health Sciences Center so that documents and witnesses associated with the patent are located in Colorado. *See* Declaration of Robert H. Allen, Exhibit A to Plaintiff's Opposition, at ¶¶ 3-4). While such facts might not be relevant if the validity of the patent were not at issue, it appears in this case that validity will be very much at issue. *See* Defendant's Motion to Stay (Dkt.# 30) filed December 30, 2005. In addition, the University of Colorado has an interest in the litigation as a part owner of royalties from the patent. Declaration of Robert H. Allen at ¶ 5. Thus Colorado has an interest in this dispute, and plaintiff has a specific interest in seeking relief here.

*7 While it is true that this case could be litigated in California where defendant maintains its principal place of business, or perhaps in Connecticut where plaintiff has its principal place of business, there is no

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 898131 (D.Colo.)
(Cite as: Not Reported in F.Supp.2d)

compelling case that the exercise of jurisdiction in Colorado is unreasonable or unfair. Because the exercise of specific jurisdiction is proper, there is no need to analyze plaintiff's arguments related to general jurisdiction.

### B. Motion to Dismiss For Lack of Venue

Defendant correctly states that venue under the patent venue statute, 28 U.S.C. § 1400(b) is proper only in "any judicial district where the defendant resides" or alternatively, "where the defendant has committed acts of infringement and has a regular and established place of business." However, as defendant acknowledges (Defendant's Brief at 9), although its place of business is in California for purposes of the venue statute it "resides" in any judicial district in which it is subject to personal jurisdiction. *See Dart Int'l, Inc., v. Interactive Target Sys., Inc.,* 877 F.Supp. 541, 546 (D.Colo.1995); *see also OpenLCR.com, Inc. v. Rates Technology, Inc.* 112 F.Supp.2d 1223, 1230 (D.Colo.2000). Having found that personal jurisdiction over defendant may be exercised in Colorado, its motion to transfer venue must be DENIED.

### C. Motion to Transfer Venue to California

In support of its request to transfer venue to California, defendant cites to nine factors that the Tenth Circuit recognizes as relevant in considering a venue transfer motion (Defendant's Motion at 10-11), but argues only some of those. The Court does not find that any of them suggest a venue transfer.

First, contrary to defendant's suggestion, the plaintiff's choice of forum should be given at least some weight here, for as explained above, plaintiff did not randomly choose Colorado for the filing of this suit. Second, the accessibility of witnesses may also favor venue in Colorado, for while defendant's witnesses may well reside in California as it asserts, nonparty witnesses are more likely to be found in Colorado, including parties who were solicited to buy the alleged infringing product or accessed defendant's website, the University personnel who may testify regarding the validity of the

patent, and perhaps others who may testify regarding damages.

Third, this Court does not agree that this case can be resolved more expeditiously in California. Although the statistics cited by defendant may be valid, they do not demonstrate a huge variance between the districts, and in any event, they do not necessarily apply to the rapidity with which this particular Court can advance this case to trial. This Court believes it could bring this case to trial in less time than the 26.4 months average cited by defendant. But, the reality of this case is that defendant is not in a hurry to bring the case to trial, and as reflected in its motion for stay prefers that this case await the outcome of the case pending before the Supreme Court, *Lab. Corp. of Am. Holdings v. Metabolite Lab's, Inc.,* --- U.S. ----, 126 S.Ct. 601, 163 L.Ed.2d 501 (2005), in which the validity of the '658 patent may be determined.[FN2]

> FN2. The Court notes that oral argument before the Supreme Court in *Lab. Corp. of Am. Holdings v. Metabolite Lab's, Inc.,* was held on March 21, 2006.

*8 Accordingly, the motion to transfer venue pursuant to 28 U.S.C. § 1404(a) is DENIED.

### CONCLUSION

Defendant's Corrected Motion to Dismiss, or in the Alternative, Motion To Transfer Venue (Dkt.# 17), filed October 13, 2005, is DENIED.

D.Colo.,2006.
Competitive Technologies, Inc. v. Carolina Liquid Chemistries Corp.
Not Reported in F.Supp.2d, 2006 WL 898131 (D.Colo.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX H

Westlaw.

Slip Copy                                                                                           Page 1
Slip Copy, 2006 WL 2946179 (D.Del.)
**(Cite as: Slip Copy)**

C
Nice Systems, Inc. v. Witness Systems, Inc.
D.Del.,2006.
Only the Westlaw citation is currently available.
    United States District Court,D. Delaware.
    NICE SYSTEMS, INC., and Nice Systems, Ltd.
                     Plaintiffs
                         v.
    WITNESS SYSTEMS, INC. Defendant
            **No. CIV A 06-311-JJF.**

            Oct. 12, 2006.

Josy W. Ingersoll, Melanie K. Sharp, Young, Conaway,
Stargatt & Taylor, Wilmington, DE, for Plaintiffs.
Kyle Wagner Compton, William J. Marsden, Jr., Fish
& Richardson, P.C., John D. Hamann, Nagendra Setty,
Pro Hac Vice, Wilmington, DE, for Defendant.

            *MEMORANDUM ORDER*
FARNAN, J.
**\*1** Pending before the Court is Defendant's Motion For
Transfer To The Northern District Of Georgia (D.I.13).
For the reasons discussed, the Motion will be denied.


            I. BACKGROUND

On May 10, 2006, Plaintiffs (collectively, "NICE")
filed this patent infringement case alleging that
Defendant's products related to technology used in call
centers infringe ten U.S. patents held by Plaintiffs.
Plaintiffs are incorporated in Delaware. The parent
company, NICE Systems, Ltd., is headquartered in
Israel. Plaintiffs' principal place of business in the
United States is in New Jersey. Defendant is
incorporated in Delaware with its principal place of
business in Atlanta, Georgia. The parties are currently
litigating three patent infringement cases in the
Northern District of Georgia. On June 19, 2006,
Defendant Witness Systems, Inc. ("Witness") filed this
Motion For Transfer To The Northern District Of

Georgia (D.I.13).


            II. PARTIES' CONTENTIONS

By its Motion, Defendant contends transfer to the
Northern District of Georgia is appropriate pursuant to
28 U.S.C. § 1404(a) and warranted by the private and
public interest factors identified in *Jumara v. State
Farm Ins. Co.,* 55 F.3d 873 (3d Cir.1995). Specifically,
Defendant contends that a transfer would best serve the
interests of justice and promote judicial economy
because litigation is pending in three cases in the
Northern District of Georgia that implicate the same or
similar technologies and products. Defendant further
contends the convenience of the parties and witnesses
will be best served by transfer.

In response, Plaintiffs contend that its choice to bring
suit in Delaware is entitled to substantial deference
because it chose to litigate in Delaware for a rational
and legitimate reason, namely, its incorporation in the
state. Plaintiffs further contend that Defendant has not
met its burden to show that the factors in *Jumara*
"strongly favor" transfer pursuant to *Shutte v. Armco
Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970).


            III. LEGAL STANDARD

Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience
of the parties and witnesses, in the interest of justice, a
district court may transfer any civil action to any other
district or division where it might have been brought."
The Third Circuit has set forth a list of factors for
district courts to consider when deciding whether or not
to transfer. *Jumara,* 55 F.3d at 879-80. These factors
include six private interests: (1) the plaintiff's forum
preference as evidenced by his or her original choice,
(2) the defendant's preference, (3) whether the claim
arose elsewhere, (4) the convenience of the parties due
to their relative physical and financial condition, (5) the
convenience of the expected witnesses, but only so far
as the witnesses might be unavailable for trial if the trial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2006 WL 2946179 (D.Del.)
**(Cite as: Slip Copy)**

is conducted in a certain forum, and (6) the location of books and records, to the extent that the books and records could not be produced in a certain forum. *Id.* at 879. The factors also include six public interests for courts to consider: (1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases. *Id.* at 879-80. Ordinarily, the burden is on the movant to establish that the balance of the interests weighs strongly in favor of the requested transfer. *Shutte,* 431 F.2d at 25. A transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer. *Continental Cas. Co. v. Am. Home Assurance Co.,* 61 F.Supp.2d 128, 131 (D.Del.1999).

### IV. DISCUSSION

#### A. *Whether Plaintiffs' Choice Of Forum Is Entitled To "Paramount Consideration."*

**\*2** The Plaintiffs' choice of forum is entitled to "paramount consideration." *Shutte,* 431 F.2d at 25. This choice should not be lightly disturbed if there is a legitimate, rational reason to litigate away from the corporation's "home turf." *Waste Distillation Tech., Inc. v. Pan Am. Res., Inc.,* 775 F.Supp. 759, 764 (D.Del.1991). A corporation's decision to incorporate in a particular state is a rational and legitimate reason to choose to litigate in that state. *Stratos Lightwave, Inc. v. E20 Communs., Inc.,* 2002 U.S. Dist. LEXIS 5653 at \*7 (D.Del.2002). The Court concludes that Plaintiffs' decision to litigate in Delaware is entitled to deference because although its principal place of business is in New Jersey, it is incorporated in Delaware. Thus, to prevail on its Motion, Defendant must prove that the public and private interest factors strongly favor transfer.

#### B. *Whether The Private Interest Factors Strongly*

*Favor Transfer.*

The Court concludes that Defendant has not met its burden of demonstrating the private interest factors weigh strongly in favor of transfer. Defendant contends that the convenience of the parties and witnesses warrants a transfer. (D.I. 15 at 20). Defendant concedes the other private interest factors are "either inapplicable or neutral to the question of transfer." (D.I. 15 at 20, n. 15). With respect to the convenience of the parties, Defendant contends that the Northern District of Georgia is "more convenient for Witness and at least as convenient for NICE." (D.I. 15 at 21). However, a transfer is not warranted "simply because the transferee court is more convenient for defendants." *Ballard Medical Products v. Concord Laboratories, Inc.,* 700 F.Supp. 796, 801 (D.Del.1988) (citing *Derry Finance v. Christiana Companies, Inc.,* 555 F.Supp. 1043, 1046 (D.Del.1983). Further, both parties are incorporated in Delaware, and therefore, chose to be corporate citizens of Delaware for legal and other purposes. Certainly, the parties, specifically Defendant, cannot now complain because they are involved in litigation in Delaware. In these circumstances, the Court concludes that Defendant has not demonstrated that the convenience of the parties would be so greatly burdened by litigating in Delaware as to weigh strongly in favor of transfer.

With respect to the convenience of the witnesses, the Court concludes that this factor does not weigh strongly in favor of transfer. Defendant contends that its employees and former employees reside near Atlanta, Georgia, as well as several "key" witnesses. The convenience of the witnesses is only relevant to the extent they would be unavailable for trial in the forum. *Jumara,* 55 F.3d at 879. Employee witnesses, however, are not part of the analysis of this factor because they are presumed willing to testify at trial.

With respect to Defendant's former employee witnesses, the Court concludes their convenience weighs slightly in favor of transfer. Defendant contends that the former employees in Georgia are key witnesses that cannot be compelled to be present at trial in Delaware. The Court concludes that because these potential witnesses may be beyond the Court's subpoena power, this factor weighs in favor of transfer. However, Defendant has not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2946179 (D.Del.)
**(Cite as: Slip Copy)**

Page 3

demonstrated that the witnesses would be unwilling to testify voluntarily or that their information is not available in another form. Accordingly, the Court concludes that this factor does not weigh strongly in favor of transfer.

### C. *Whether The Public Interests Strongly Favor Transfer*

**\*3** The Court concludes that the public interests do not weigh strongly in favor of a transfer. With respect to Defendant's contention that practical considerations of judicial economy weigh strongly in favor of transfer, the Court concludes this factor weighs only slightly in favor of transfer. Although the instant action involves some overlap of parties, products, and technologies with the three cases pending in the Northern District of Georgia, the Court concludes that the actions are not sufficiently related to warrant transfer. The three actions pending in Georgia are at various stages of litigation before three different judges and two of the pending cases have survived a motion to consolidate. The Court concludes that adding another case to the Northern District of Georgia docket will not serve the interests of judicial economy more than litigating the instant case in this Court. Thus, the Court concludes this factor does not weigh strongly in favor of transfer.

Additionally, the Court finds there is no strong local interest in litigating this action in Georgia. The instant action is a patent infringement case and patent rights generally do not give rise to a local controversy or implicate local interests. Thus, the Court concludes this factor does not weigh strongly in favor of transfer. For the reasons discussed, the Court will deny Defendant's Motion For Transfer.

### ORDER

NOW THEREFORE IT IS HEREBY ORDERED this *12* day of October, 2006, that Defendant Witness Systems, Inc.'s Motion For Transfer To The Northern District of Georgia (D.I.13) is *DENIED*.

D.Del.,2006.

Nice Systems, Inc. v. Witness Systems, Inc.
Slip Copy, 2006 WL 2946179 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX I

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 441077 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

⋈
Trilegiant Loyalty Solutions, Inc. v. Maritz, Inc.
D.Del.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
TRILEGIANT LOYALTY SOLUTIONS, INC.
Plaintiff,
v.
MARITZ, INC., Defendant.
No. Civ.A. 04-360 JJF.

Feb. 15, 2005.

Jack B. Blumenfeld, and Rodger D. Smith II, of Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware,
Steven Lieberman, Sharon L. Davis, and R. Elizabeth
Brenner, of Rothwell, Figg, Ernst & Manbeck, P.C.,
Washington, D.C., for Plaintiff, of counsel.
Rudolf E. Hutz, and Patricia Smink Rogowski, of
Connolly Bove Lodge & Hutz LLP, Wilmington,
Delaware, J. Bennett Clark, Jennifer E. Hoekel, and
Marc W. Vander Tuig, of Senniger Powers, St. Louis,
Missouri, for Defendant, of counsel.

*MEMORANDUM OPINION*
FARNAN, J.
*1 Presently before the Court is the Motion To Transfer
Under 28 U.S.C. § 1404(a) (D.I.13) filed by Defendant
Maritz, Inc. ("Maritz"). For the reasons discussed,
Maritz's Motion To Transfer will be denied.

BACKGROUND

Plaintiff Trilegiant Loyalty Solutions, Inc.
("Trilegiant") initiated this lawsuit in this Court alleging
patent infringement arising from Defendant Maritz's
development and operation of online incentive
programs. Trilegiant is incorporated in Delaware, and
has its principal place of business in Richmond,
Virginia. Maritz is a Missouri corporation with its
principal place of business in Fenton, Missouri.

PARTIES' CONTENTIONS

By its motion, Maritz contends that a transfer to the
Eastern District of Missouri is appropriate in this case
pursuant to the factors identified in *Jumara v. State
Farm Insurance Co.,* 55 F.3d 873 (3d Cir.1995). Maritz
contends that both the private and public interests favor
a transfer to Missouri. With regard to the private
interests, Maritz contends that none of the parties has a
presence in Delaware, and that transfer to the Eastern
District of Missouri would not significantly change the
burden Trilegiant already bears by virtue of choosing
Delaware. Maritz further contends that party witnesses
and potential non-party witnesses appear to be located
far from Delaware. Maritz also contends that accused
activities likely took place in Missouri and that relevant
documents are not likely to be located in Delaware.
With regard to the public interests, Maritz contends that
none of the interests involved in this lawsuit are unique
to Delaware and that Missouri is the more practical
venue for this lawsuit. Maritz did not address the
following factors: 1) likelihood of an enforcement
problem; 2) administrative difficulty in the two fora
resulting from court congestion, and 3) familiarity with
applicable state law.

In response, Trilegiant claims that its choice to bring
suit in Delaware is entitled to substantial deference
because Trilegiant chose to litigate in Delaware for
several rational and legitimate reasons. Trilegiant
contends that it sought the benefits of Delaware law by
incorporation in this state. Trilegiant further contends
that Magistrate Thyne mediated a previous case that
involved two of the three patents in this suit. With
regard to the convenience of the parties and witnesses,
Trilegiant contends that Delaware is more convenient
than Missouri for it and the inventor, Mr. Storey.
Trilegiant stresses the Delaware Court has subpoena
power over potential third-party Delaware corporations
that would make access to documents easier in
Delaware than in Missouri.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 441077 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

### DISCUSSION

#### I. Legal Standard

Maritz moves for a transfer to the Eastern District of Missouri pursuant to 28 U.S.C. § 1404(a). Section 1404(a) is the general transfer statute that provides, "For the convenience of the parties and the witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it may have been brought." Courts in the Third Circuit apply the public and private interest factors outlined in *Jumara v. State Farm Insurance Co., 55 F.3d 873 (3d Cir.1995)*, to decide if they should order a transfer. The private interests outlined in *Jumara* include: (1) Plaintiff's forum preference; (2) Defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties; (5) the convenience of the witnesses-but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of books and records-but only to the extent that the documents may be unavailable for trial in one of the fora. *Id.* at 879 (citations omitted).

**\*2** The public interests include "the enforceability of the judgment, practical considerations that could make the trial easy, expeditious, or inexpensive, the relative administrative difficulty in the two fora resulting from court congestion, the local interest ..., [and] the public policies of the fora." *Id.*

Maritz bears the burden of establishing the need for transfer. *Id.*

#### II. Analysis

##### A. Whether Plaintiffs' Choice Of Forum Is Entitled To "Paramount Consideration"

Ordinarily, a court will give "paramount consideration" to a plaintiff's choice of forum. *See Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir.1970)*. However, absent a legitimate, rational reason, if the plaintiff chooses to litigate away from his or her "home turf," the

defendant's burden is lessened. *Waste Distillation Tech., Inc. v. Pan Am. Res., Inc., 775 F.Supp. 759, 764 (D.Del.1991)*. Under Section 1404(a), "home turf" refers to a corporation's principal place of business. *Id.* A corporation's decision to incorporate in a particular state is a rational and legitimate reason to choose to litigate in that state. *Stratos Lightwave, Inc. v. E20 Communications, Inc., C.A. No. 01-309 JJF, 2002 WL 500920 at \*2 (D.Del. March 26, 2002)*.

Applying these principles to the circumstances in this case, the Court will give "paramount consideration" to Trilegiant's decision to file the instant action in Delaware. Trilegiant is a Delaware corporation. As the Court observed in *Stratos*, a corporation's decision to incorporate in a state is a rational and legitimate reason to file an action in that forum. 2002 WL 500920 at \*2. Therefore, to prevail on its Motion, Maritz must demonstrate that the *Jumara* factors strongly favor a transfer to Missouri.

##### B. Whether The Private Interests Strongly Favor Transfer

Although the claim arose and Maritz has its principal place of business in Missouri, I conclude that these factors, along with the remaining *Jumara* private interest considerations, do not strongly favor a transfer to Missouri.

First, I conclude that the convenience of the parties does not favor venue in Missouri over Delaware. Neither party would be unduly burdened by litigating this action in Delaware. *See Pennwalt Corp. v. Purex Inds., Inc., 659 F.Supp. 287, 290 (D.Del.1986)* (taking into account the burden a small company would encounter in litigating an action in a jurisdiction where it did not reside). Maritz's annual sales approximate $1.4 billion (D.I. 16 App. D) and Trilgiant chose to litigate in Delaware. Therefore, I conclude that litigating this action in Delaware will not "place a significant and onerous burden" on either party. *Pennwalt, 659 F.Supp. at 290.*

Next, although Maritz contends that the books and records necessary to litigate this action are in Missouri,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 441077 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

Maritz does not contend that they could not be produced or would be unavailable in Delaware. Therefore, I do not consider the location of the books and records as weighing in favor of a transfer to Missouri. *See Jumara, 55 F.3d at 879* (indicating that a court should consider the location of books and records only to the extent that the files "could not be produced in the alternative forum").

**\*3** Further, party witnesses or witnesses who are employed by Maritz or Trilegiant carry no weight in the "balance of convenience" analysis since each party is able to procure the attendance of its own employees. *See Affymetrix, Inc. v. Synteni, Inc., 28 F.Supp.2d 192, 203 (D.Del.1998).* With respect to Mr. Storey, the inventor of the patents-in-suit and a non-party witness, Maritz does not contend that he would be unavailable for trial in Delaware, and Maritz has provided the Court with no evidence that Mr. Storey, would be unwilling to testify on its behalf. Accordingly, I give little weight to Mr. Storey's status as a non-party witness and residence outside of Delaware.

Finally, although I appreciate the additional expense that Maritz may incur as a result of litigating in Delaware, I find that this hardship is substantially outweighed by the private interest considerations.

### C. Whether The Public Interests Strongly Favor Transfer

I also conclude that the public interests do not weigh strongly in favor of a transfer to Missouri. Maritz did not argue that the congestion of the Delaware courts strongly favors a transfer. Further, there is no strong local interest in litigating this action in Missouri. The instant action is a patent infringement case, and, as the Court held in *Stratos,* rights relating to patents are not local or state matters. *Stratos, 2002 WL 500920 at \*2.* Therefore, patent rights do not alone give rise to a local controversy or implicate local interests. *Id.* Accordingly, I conclude that the fact that the alleged infringement occurred in Missouri does not weigh strongly in favor of transferring the instant action.

In addition, I find that the *Jumara* factor that requires

examining the difficulty in enforcing a judgment, were Trilegiant to prevail in the Delaware litigation, does not weigh in favor or against a transfer because there has been no dispute in either state over in personam jurisdiction.

### CONCLUSION

Based upon Trilegiant's decision to file the instant lawsuit in Delaware and the absence of strong private or public interests favoring transfer to Missouri, I conclude that the *Jumara* factors do not strongly favor a transfer of the instant action under 28 U.S.C. § 1404(a). Accordingly, I will deny Maritz's Motion.

An appropriate Order will be entered.

### *ORDER*

At Wilmington, this 15th day of February 2005, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS HEREBY ORDERED that the Motion To Transfer (D.I.13) filed by Defendant is *DENIED.*

D.Del.,2005.
Trilegiant Loyalty Solutions, Inc. v. Maritz, Inc.
Not Reported in F.Supp.2d, 2005 WL 441077 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX J



Not Reported in F.Supp.2d                                                                                               Page 1
Not Reported in F.Supp.2d, 2001 WL 34368395 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Nilssen v. Osram Sylvania, Inc.
D.Del.,2001.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Ole K. NILSSEN and Geo Foundation, Ltd.,
Plaintiffs,
v.
OSRAM SYLVANIA, INC. and Osram Sylvania
Products, Inc., Defendants.
**No. Civ.A. 00-695-JJF.**

May 1, 2001.

Donald F. Parsons, Jr., and Mona A. Lee, of Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware,
Harry J. Roper, Raymond N. Nimrod, John E. Titus,
and Jonathon Hill, of Roper & Quigg, Chicago, Illinois,
for Plaintiffs, of counsel.
Richard K. Herrmann, of Blank Rome Comisky &
Mccauley LLP, Wilmington, Delaware, Brian D. Sieve,
Thomas G. Pasternak, Andrew M. Johnstone, and
Kevin J. O'Shea, of Kirkland & Ellis, Chicago, Illinois,
for Defendants, of counsel.

*MEMORANDUM OPINION*
FARNAN, J.
**\*1** Presently before the Court is Defendants' Motion to
Transfer Pursuant to 28 U.S.C. § 1404(a) (D.I.15). For
the reasons stated below, the Court will grant the
motion.

BACKGROUND

Ole K. Nilssen ("Mr.Nilssen") is a Florida resident with
his principal place of business in Chicago, Illinois.[FN1]
(D.I. 1 at ¶ 4). Mr. Nilssen is engaged in the business of
"identifying, formulating plans for, developing
know-how and technology for, and implementing (via
licensing agreements) promising new business
opportunities in the field of electronics, including

electronic ballasts." (D.I. 1 at ¶ 8). Geo Foundation
("Geo") is a non-profit corporation incorporated in the
Cayman Islands, British West Indies. (D.I. 1 at ¶ 5)(Mr.
Nilssen and Geo collectively referred to as "Plaintiffs").

> FN1. Mr. Nilssen contends that his ongoing
> business in Illinois, Innovations Center, "is
> now defunct." (D.I. 24, Exh. 1 at ¶ 8).
> However, Plaintiffs' Complaint alleges that
> Mr. Nilssen is currently engaged in "business
> opportunities." (D.I. 1 at ¶ 4). Further, Mr.
> Nilssen admits that he still travels to Illinois
> regularly to "bring closure to [his] other
> business dealings that take place in Illinois."
> (D.I. 24, Exh. 1 at ¶ 8). The Court concludes
> that, for purposes of the instant motion, this
> record sufficiently establishes that Mr.
> Nilssen's principal place of business is in
> Illinois.

OSRAM Sylvania, Inc. and OSRAM Sylvania
Products, Inc. (collectively "Defendants") are Delaware
corporations with their principal places of business in
Danvers, Massachusetts. (D.I. 13 at ¶ 6-7). Defendants
are engaged in the business of making and selling
electronic ballasts. (D.I. 13 at ¶¶ 11).

Plaintiffs filed the instant action against Defendants on
August 1, 2000. In their Complaint, Plaintiffs contend
that Defendants wilfully infringe twenty-six patents that
were invented and are owned by Mr. Nilssen and of
which Geo holds exclusive licenses.[FN2] (D.I. 1 at ¶¶ 9,
10, 13). On January 24, 2001, Defendants filed the
instant motion to transfer the case to the United States
District Court for the Northern District of Illinois.
(D.I.15).

> FN2. These patents include U.S. Patent No.
> B1 4,667,345; U.S. Patent No. 4,857,806;
> U.S. Patent No. 4,954,754; U.S. Patent No.
> 4,983,887; U.S. Patent No. 5,013,974; U.S.
> Patent No. 5,047,690; U.S. Patent No.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34368395 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

5,164,637; U.S. Patent No. 5,185,560; U.S. Patent No. 5,189,342; U.S. Patent No. 5,191,262; U.S. Patent No. 5,214,356; U.S. Patent No. 5,233,270; U.S. Patent No. 5,341,067; U.S. Patent No. 5,343,123; U.S. Patent No. 5,402,043; U.S. Patent No. 5,416,386; U.S. Patent No. 5,432,409; U.S. Patent No. 5,446,347; U.S. Patent No. 5,471,118; U.S. Patent No. 5,479,074; U.S. Patent No. 5,481,160; U.S. Patent No. 5,510,680; U.S. Patent No. 5,510,681; U.S. Patent No. 5,621,279; U.S. Patent No. 5,736,819 and U.S. Patent No. 6,002,210. (D.I. 1 at ¶ 9).

## DISCUSSION

Under 28 U.S.C. § 1404(a), "for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Since it is undisputed that Plaintiffs could have brought the instant action in the Northern District of Illinois, the Court's only task is to determine whether the factors enumerated in § 1404(a) warrant a transfer under the circumstances.

In determining whether or not to transfer venue under § 1404(a), a district court must consider a number of different factors. These factors include several private interests: (1) the convenience of the parties due to their relative physical and financial conditions, (2) the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (3) the location of books and records, to the extent that these books and records could not be produced in a certain forum. *Memminger v. InfoCure Corp.,* C.A. No. 00-707-JJF, slip op. at 4 (D.Del. Nov. 14, 2000)(citing *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995)).[FN3] These factors also include several public interests:

> FN3. *Jumara* also listed the following private interests that district courts should consider: (1) the plaintiff's choice of forum, (2) the

defendant's preferred forum, and (3) whether the claim arose elsewhere. 55 F.3d at 879. Subsequent decisions of this Court, however, have determined that these interests are subsumed by the other *Jumara* factors. *Memminger,* slip op. at 5. Therefore, to avoid considering the same interests twice, the Court will not considered them separately. *Id.*

(1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases.
*2 *Id.* (citing *Jumara,* 55 F.3d at 879-80). When determining whether or not transfer is warranted under the circumstances, district courts must balance all of the relevant factors. *Jumara,* 55 F.3d at 883. "The burden is upon the [moving party] to establish that the balance of the [factors] strongly weighs in favor of the requested transfer, and a transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer." *Memminger,* slip op. at 4-5. Below, the Court will analyze the factors relevant to the instant motion.

### A. Convenience of the Parties

The Court concludes that the convenience of the parties due to their relative physical and financial conditions weighs slightly in favor of transfer. Defendants' principal places of business are located in Danvers, Massachusetts. (D.I. 16 at 5). Many of Defendants' accused products are manufactured in Lake Zurich, Illinois, which is within the Northern District of Illinois. (D.I. 16 at 5). Defendants' contacts with Delaware, on the other hand, are minimal: Defendants are incorporated under Delaware law, Defendants have one salesperson who works out of a home office in Delaware, and some of Defendants' accused products are sold in Delaware.[FN4] (D.I. 16 at 5). *See Memminger,* slip op. at 6-7 (recognizing that the mere fact a defendant is incorporated in a given forum does not mean that transfer to another forum is not warranted);

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34368395 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

*Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.,* 11 F.Supp.2d 729, 730-30 (S.D.N.Y.1998)(holding that the Southern District of New York's connection to the litigation was "tenuous" for purposes of venue transfer analysis when the defendant was incorporated in New York and over 100 of the defendant's allegedly infringing products were sold in New York). Also supporting the requested transfer is the fact that Mr. Nilssen's principal place of business is in Illinois, and that several of his current and former employees reside in Illinois.

> FN4. Plaintiffs' contention that their "claim arose" in Delaware, because some of Defendants' accused products are sold in Delaware, lacks merit. Defendants' products are sold nationwide; therefore, Delaware does not have any special "connection" to the case that would weigh against the requested transfer.

Based on these considerations, the Court concludes that it would be more convenient to litigate in the Northern District of Illinois rather than in Delaware. However, this factor weighs only slightly in favor of transfer because both Defendants are large companies that are financially capable of litigating in a distant forum. *Motorola Inc. v. PC-Tel. Inc.,* 58 F.Supp.2d 349, 358 (D.Del.1999)(holding that when the party seeking transfer is a multimillion dollar company, unless the company can articulate "some unique or unexpected burden" associated with litigating in a distant forum, this factor only weighs slightly in favor of transfer).

### B. Convenience of the Witnesses

The Court concludes that the convenience of the witnesses weighs strongly in favor of transfer. The convenience of the witnesses is the most important factor in venue transfer analysis. *Mentor Graphics v. Quickturn Design Sys., Inc.,* 77 F.Supp.2d 505, 510 (D.Del.1999). The convenience of a witness is only relevant, however, "to the extent that the witness may actually be unavailable for trial in one of the fora." *Asten Inc. v. Weavexx Corp.,* 2000 WL 1728354, at *4

(D.Del. Feb. 11, 2000)(quoting *Jumara,* 55 F.3d at 879). A party need not allege that a witness definitely will be unavailable for trial; rather, it is sufficient for purposes of venue transfer analysis if the witness is not subject to a court's subpoena power. *Mentor Graphics,* 77 F.Supp.2d at 511. However, witnesses employed by the parties are not considered by a court conducting venue transfer analysis because the parties are obligated to procure the presence of their own employees at trial. *Id.*

**\*3** In the instant case, Defendants contend that no witnesses reside in Delaware but that a number of principal witnesses reside in the Northern District of Illinois, including: (1) Dale Fiene-an employee of Mr. Nilssen, (2) Robert Schneider-a former employee of Mr. Nilssen, (3) employees of Defendants, (4) employees of Motorola, Inc, and (5) employees of Advance Transformer, Inc. ("Advance"). (D.I. 16 at 10). In response, Plaintiffs contend that Defendants' contentions are unavailing because (1) Defendants have failed to explain the nature of these witnesses' testimony, and in several cases, have even failed to name the witnesses, (2) Defendants have failed to show that the use of videotaped deposition testimony would be an inadequate substitute for live trial testimony, and (3) Defendants have not alleged that any witnesses actually will be unavailable for trial. (D.I. 25 at 11).

The Court concludes that Plaintiffs' second and third arguments can be summarily rejected. As to Plaintiffs' third argument, as previously discussed, a party only needs to establish that witnesses might be unavailable for trial. As to Plaintiffs' second argument, the Court concludes that videotaped depositions are not an adequate substitute for live trial testimony when conducting venue transfer analysis because "[v]ideo depositions ... are unlikely to hold the rapt attention of a jury." *AlliedSignal, Inc. v. Cooper Auto., Inc.,* 1997 U.S. Dist. LEXIS 22902, at *11 n. 4 (D.Del. July 30, 1997).

Plaintiffs' first argument warrants more consideration. One of these witnesses, Dale Fiene, is a current employee of Mr. Nilssen; therefore, the Court concludes that Mr. Fiene should not be considered in the analysis. [FN5] (D.I. 24 at 9). The Court also agrees

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 4
Not Reported in F.Supp.2d, 2001 WL 34368395 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

that Defendants' employees do not weigh into the analysis. However, Mr. Schneider, a former employee of Mr. Nilssen, and employees from Motorola and Advance do warrant consideration because they are potential third party witnesses.

> FN5. To the extent that Mr. Nilssen admits that Mr. Fiene is a current employee, such admission belies Mr. Nilssen's attempt to downplay the extent of his business contacts in Illinois.

Plaintiffs contend that these potential third party witnesses do not weigh in favor of transfer because Defendants have failed to specifically identify many of these witnesses by name and/or the content of their testimony. (D.I. 24 at 10-11). However, Defendants specifically identify Mr. Schneider and note that his testimony is relevant because Mr. Schneider has submitted a number of affidavits to the PTO on Mr. Nilssen's behalf. (D.I. 16 at 10). Mr. Schneider's knowledge is relevant to Defendants' affirmative defenses, especially Defendants' allegations of inequitable conduct by Mr. Nilssen during the prosecution of many of the patents in suit.

Defendants' potential witnesses from Motorola and Advance have not been identified by name. However, Defendants indicate that Motorola's employees will testify about Motorola's business dealings with Mr. Nilssen and about prior art to the patents in suit. (D.I. 16 at 10). Defendants also indicate that Advance's employees will provide relevant testimony about a reasonable royalty and about prior art.[FN6] (D.I. 16 at 10). The Court concludes that such identification, especially when fact discovery has yet to take place and when Plaintiffs have yet to specify the specific patent claims and products implicated in the lawsuit, is sufficient for purposes of venue transfer analysis.[FN7] Therefore, the Court concludes that the convenience of the witnesses strongly weighs in favor of transfer.

> FN6. Advance's employees are knowledgeable on such issues because Advance has a license agreement with Mr. Nilssen. (D.I. 16 at 10).

> FN7. The cases cited by Plaintiffs in which the Court refused to afford unnamed witnesses any weight in the analysis involved situations where the movant merely stated that some witnesses existed that would not be available for trial. (D.I. 24 at 10-11)(citing *Motorola,* 58 F.Supp.2d at 359; *Sunds Defribator, Inc. v. Durametal Corp.,* 1997 WL 74660, at *3 (D.Del. Jan. 31, 1997)). Defendants' identification of the witnesses distinguishes the instant case from *Motorola* and *Sunds Defribator.*

### C. Practical Considerations

**\*4** The Court also concludes that practical considerations regarding the ease, speed, or expense of trial strongly weigh in favor of the requested transfer. If related cases are pending in the district to which transfer is sought, such fact weighs in favor of the transfer. *Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 206 (D.Del.1998). In a recent case granting a motion to transfer, the Court relied heavily on the existence of patent litigation in another forum involving "a parent patent of the one at issue" and a patent involving a similar type of product which was arguably "directly related" to the patent at issue. *Brunswick Corp. v. Precor Incorp.,* 2000 WL 1876477, at *3, n. 2 (D.Del. Dec. 12, 2000).

In the instant action, Plaintiffs allege infringement of twenty-six patents, at least six of which are also being litigated in the Northern District of Illinois.[FN8] In the Illinois cases, *Markman* rulings have already been issued and case dispositive motions have already been filed. (D.I. 16 at 4). Therefore, the Court concludes that the waste of judicial resources in requiring two different courts to construe at least six of the same patents, [FN9] and to render *Markman* rulings on each of these patents, is a factor that strongly weighs in favor of transfer.[FN10]

> FN8. The number of patents in the instant case that overlap with patents involved in cases pending in the Northern District of Illinois is in dispute. Defendants contend that thirteen of the patents in this case are being litigated in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34368395 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

*Nilssen v. Motorola, Inc.,* Case No. 96-5571, and that three of these patents are also being litigated in *Nilssen v. MagneTek, Inc.,* Case No. 98-2229. (D.I. 16 at 4). Plaintiffs respond that only six patents overlap between the *Motorola* case and the action presently before the Court. (D.I. 24 at 12 & n. 4). The Court concludes that it is unnecessary to determine exactly how many of the patents overlap and will accept as true, for purposes of this motion, that only six patents overlap.

FN9. Defendants point out that the file wrapper for one of the overlapping patents consists of over 1,700 pages.

FN10. Plaintiffs contend that the doctrine of collateral estoppel will prevent any waste of judicial resources by precluding duplicative litigation. However, collateral estoppel only applies when a final judgment is rendered, so it could take months or years for collateral estoppel to become applicable. If *Markman* rulings are issued in the instant case that conflict with those rendered in the Northern District of Illinois prior to collateral estoppel becoming applicable, this could result in inconsistent judgments virtually guaranteeing that one of the judgments will get reversed on appeal. This judicial waste can be avoided by granting the instant motion to transfer.

## CONCLUSION

In balance, the Court concludes that the relevant factors strongly weigh in favor of a transfer to the Northern District of Illinois. Both the convenience of the witnesses and practical considerations strongly weigh in favor of transfer, and the convenience of the parties weighs slightly in favor of transfer. On the other hand, no factors weigh against the requested transfer. [FN11] As a result, the Court concludes that a transfer to the Northern District of Illinois is warranted under the circumstances.

FN11. Plaintiffs contend that they have a

legitimate desire to litigate in Delaware in order to quickly resolve the matter, and that this factor weighs in favor of transfer. (D.I. 24 at 12). However, the statistical evidence submitted by Defendants reveal that civil cases are, on average, resolved more quickly in the Northern District of Illinois than in Delaware; however, in cases that ultimately go to trial, Delaware is a more expedient forum. (D.I.16, Exh. H). Furthermore, Plaintiffs have admitted that the slow pace in the cases pending in the Northern District of Illinois is "due to the pace set by the lawyers." (D.I. 25, Exh. B at 2). Plaintiffs nonetheless assert that, because a trial date has already been set in the instant case for February 11, 2002, the instant suit will be resolved more quickly if tried in Delaware. However, in complex patent cases such as this, the initial trial date is often pushed back as discovery problems arise. Considering the number of patents at issue in this case and that discovery has yet to commence, the February 11, 2002 trial date looks unrealistic.

After the briefing in this matter was completed, Plaintiffs sent two letters to the Court (D.I. 27; D.I. 28) indicating that the summary judgment motions pending in the Northern District of Illinois cases were going to be further delayed because the motions had been referred to a special master. However, the Northern District of Illinois's referral order, which is attached to one of Plaintiffs' letters, highlights the fact that quick resolution of the lawsuit in this District is unlikely. The Order stated that: "the voluminous documents and arguments involved in the case" and "the legal and factual complexity of the case" would be such a drain on judicial resources that the appointment of a special master is warranted. (D.I.28). The Court concludes that requiring two different courts to duplicate much of the same work would be inefficient and would not produce a more expedient resolution in this forum.

An appropriate Order will be entered.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 6
Not Reported in F.Supp.2d, 2001 WL 34368395 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

*ORDER*

At Wilmington, this *1* day of May, 2001, for the reasons
set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendants' Motion to
Transfer Pursuant to <u>28 U.S.C. § 1404(a) (D.I.15)</u> is
*GRANTED.*

D.Del.,2001.
Nilssen v. Osram Sylvania, Inc.
Not Reported in F.Supp.2d, 2001 WL 34368395
(D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.